Filed: April 28, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 98-1934
(CA-93-902-N)

R.M.S. Titanic, Inc., etc.,

                              Plaintiff - Appellee,

        versus

Christopher S. Haver, et al,

                    Parties in Interest - Appellants.

O R D E R

        The court amends its opinion filed March 24, 1999, as follows:

        On page 27, first full paragraph, line 9 -- the citation to "California, 332 at 34" is corrected to read "Louisiana, 363 U.S. at 34 . . . ."

        On page 34, first full paragraph, lines 11-12 -- the citation is corrected to end "The Akaba, 54 F. at 200."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                                      Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

R.M.S. TITANIC, INCORPORATED,
successor in interest to Titanic
Ventures, limited partnership,
Plaintiff-Appellee,

v.

CHRISTOPHER S. HAVER; DEEP OCEAN
EXPEDITIONS,
Parties in Interest-Appellants,

and

THE WRECKED AND ABANDONED VESSEL,
its engines, tackle, apparel,
appurtenances, cargo, etc., located
within one (1) nautical mile of a point
located at 41º 43' 32" North Latitude
and 49º 56' 49" West Longitude,

believed to be the R.M.S. Titanic, in
rem,
Defendant,

LIVERPOOL AND LONDON STEAMSHIP
PROTECTION AND INDEMNITY ASSOCIATION
LIMITED,
Claimant,

WILDWINGS WORLDWIDE TRAVEL;
BAKERS WORLD TRAVEL; QUARK
EXPEDITIONS, INCORPORATED; MIKE
MCDOWELL; RALPH WHITE; DON WALSH,
Ph.D.; ALFRED S. MCLAREN, Ph.D.;
R/V AKADEMIK MSTISLAV KELDYSH;
BLACKHAWK TELEVISION,
Parties in Interest,

and

No. 98-1934

JOHN A. JOSLYN,
Movant.

THE EXPLORERS CLUB; THE ADVISORY
COUNCIL ON UNDERWATER ARCHAEOLOGY;
COLUMBUS-AMERICA DISCOVERY GROUP,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
J. Calvitt Clarke, Jr., Senior District Judge.
(CA-93-902-N)

Argued: October 29, 1998

Decided: March 24, 1999

Before ERVIN, WILKINS, and NIEMEYER, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Niemeyer wrote the opinion, in which Judge Ervin and
Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** Alex Blanton, DYER, ELLIS & JOSEPH, Washington,
D.C., for Appellants. F. Bradford Stillman, MCGUIRE, WOODS,
BATTLE & BOOTHE, L.L.P., Norfolk, Virginia, for Appellee. **ON
BRIEF:** Michael Joseph, Joseph O. Click, DYER, ELLIS &
JOSEPH, Washington, D.C., for Appellants. Mark S. Davis, Douglas
E. Miller, Lee A. Handford, MCGUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., Norfolk, Virginia, for Appellee. David G. Concan-
non, KOHN, SWIFT & GRAF, P.C., Philadelphia, Pennsylvania, for
Amicus Curiae Explorers Club. John P. McMahon, MCMAHON &

2

CONNELL, P.C., Charlotte, North Carolina, for Amicus Curiae Advisory Council. Richard T. Robol, COLUMBUS-AMERICA DISCOVERY GROUP, Columbus, Ohio, for Amicus Curiae Columbus-America.

_____

## OPINION

NIEMEYER, Circuit Judge:

This appeal presents questions about the authority of a United States court to regulate the salvage rights in the wreck of the luxury liner, R.M.S. Titanic, which lies in international waters.

The Titanic was launched in 1912 as the "largest and finest steamship ever built" and with the claim that she was "unsinkable." On her maiden voyage from Southampton to New York, however, with 2,340 passengers on board, the Titanic collided with an iceberg in the North Atlantic and sank less than three hours later, on April 15, 1912. A nearby ship saved 745 persons and some lifeboats and took them to New York. Another ship recovered several hundred bodies and took them to Halifax, Nova Scotia.

In 1985, the wreck of the Titanic was discovered at the bottom of the North Atlantic in international waters, approximately 400 miles off the coast of Newfoundland in 12,500 feet of water. Salvage efforts began two years later. In 1994, the district court in the Eastern District of Virginia, exercising "constructive in rem jurisdiction" over the wreck and the wreck site of the Titanic, awarded exclusive salvage rights, as well as ownership of recovered artifacts, to R.M.S. Titanic, Inc., ("RMST"), a Florida corporation. Two years later, the court rejected a challenge to the exclusive salvage rights of RMST, see R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel, ("Titanic I"), 924 F. Supp. 714 (E.D. Va. 1996), and shortly thereafter, entered an injunction dated August 13, 1996, protecting the salvage rights of RMST against any person in the world "having notice of this Order," prohibiting any such person from "conducting search, survey, or salvage operations, or obtaining any image, photographing or recovering any objects, entering, or causing to enter" the area of the Atlantic

3

Ocean surrounding the Titanic wreck site. On June 23, 1998, the court reaffirmed, "personalized and enforced" the 1996 injunction against new parties. R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel, ("Titanic II"), 9 F. Supp.2d 624, 626 (E.D. Va. 1998). In that order, the court enjoined the appellants, Christopher S. Haver, an Arizona resident, and Deep Ocean Expeditions, ("DOE"), a British Virgin Islands corporation, as well as others from:

> (i) interfering with the rights of [RMST], as salvor in possession of the wreck and wreck site of the R.M.S. Titanic, to exclusively exploit the wreck and wreck site, (ii) conducting search, survey, or salvage operations of the wreck or wreck site, (iii) obtaining any image, video, or photograph of the wreck or wreck site, and (iv) entering or causing anyone or anything to enter the wreck or wreck site with the intention of performing any of the foregoing enjoined acts.

Id. at 640. The district court declared that the wreck site subject to the injunction was a 168-square-mile rectangular zone in the North Atlantic bounded by the following points:

> 41° 46' 25" North Latitude, 050° 00' 44" West Longitude, then east to 41° 46' 25" North Latitude, 049° 42' West Longitude, then south to 41° 34' 25" North Latitude, 049° 42' West Longitude, then west to 41° 34'  25" North Latitude, 050° 00' 44" West Longitude, then returning north to the start.

Id. DOE had planned an expedition to view and to photograph the Titanic for the late summer of 1998, and Haver had planned to be a passenger.

DOE, never a party to the proceedings in the district court, and Haver, who filed a declaratory judgment action in the district court to challenge the court's jurisdiction over the wreck and over him, appealed to this court to challenge the June 1998 injunction. They claim (1) that the district court lacked jurisdiction over the wreck and wreck site, (2) that the court lacked personal jurisdiction over them, and (3) that the scope of the injunction is too broad. As they summarize their position,

4

No theory of "constructive in rem jurisdiction" permits a court to adjudicate the rights of persons over which it lacks personal jurisdiction with respect to a vessel [in international waters] that has never been within the court's territory. Nor does any such theory authorize an injunction prohibiting persons from viewing and photographing a wreck when the salvor is not actively conducting salvage operations.

For the reasons that follow, we affirm in part and reverse in part the injunctions and remand the case to the district court with instructions to modify them in accordance with this opinion.

I

A procedural history, while somewhat involved, is nonetheless necessary for an understanding of the jurisdictional discussions that follow.

In 1985, a joint American-French expedition discovered the wreck of the Titanic. Two years later, in the summer of 1987, Titanic Ventures, a Connecticut limited partnership, in conjunction with the Institute of France for the Research and Exploration of the Sea, the French government's oceanographic institution, voluntarily undertook efforts to salvage the wreck. Titanic Ventures conducted 32 dives over 60 days, recovering approximately 1,800 artifacts. It thereafter sold both its interest in the salvage operation and the artifacts it recovered to RMST. RMST recovered another 800 artifacts during a second expedition to the Titanic's wreck site in 1993.

In August 1993, RMST filed this action in the Eastern District of Virginia, requesting, among other things, that the district court exercise in rem jurisdiction over the Titanic to award it exclusive salvage rights. In support of its request, RMST presented the court with a wine decanter salvaged from the Titanic and stated that numerous other artifacts were physically within the Eastern District of Virginia. The court issued a warrant directing the United States Marshal to arrest the wreck and all artifacts already salvaged and yet to be salvaged from the wreck and, at the same time, ordered that RMST be substituted for the Marshal as custodian of the wreck, the wreck site,

5

and the artifacts. Formal notice of the court's order appeared in three newspapers, The Virginian-Pilot, The Wall Street Journal, and The Journal of Commerce.

Only one party, Liverpool and London Steamship Protection and Indemnity Association ("Liverpool & London"), filed a claim asserting an interest in the wreck. After RMST and Liverpool & London entered into a settlement agreement, the district court dismissed Liverpool & London's claim on June 7, 1994. On the same day, the court entered a separate order granting RMST not only exclusive salvage rights over the wreck and the wreck site of the Titanic, but also "true, sole and exclusive owner[ship] of any items salvaged from the wreck."

In 1996, a competing salvor, John A. Joslyn, filed a motion in the action under Federal Rule of Civil Procedure 60(b), challenging RMST's status as exclusive salvor of the Titanic and requesting that the court rescind its June 1994 order. Joslyn claimed not only that RMST had failed diligently to salvage the Titanic, but also that RMST lacked the financial capacity to undertake future salvage operations. Following a hearing, the district court denied Joslyn's motion, finding that RMST had successfully undertaken a number of salvage operations and that its favorable prospects for ongoing and future salvage demonstrated that RMST deserved to remain the exclusive salvor-in-possession. See Titanic I, 924 F. Supp. at 722-24.

When Joslyn, nonetheless, expressed an intention to visit the wreck site for the sole purpose of taking photographs, the district court issued a temporary restraining order to prevent him from doing so. The court reasoned that "the need for R.M.S. Titanic, Inc. to have jurisdiction over the wreck site" brought with it a power to determine "who could enter the site for any purpose and who could photograph the ship and the locale." The district court converted the temporary restraining order to a preliminary injunction, dated August 13, 1996, enjoining Joslyn as well as "[a]ny other person having notice of this Order, actual or otherwise," from:

> conducting search, survey, or salvage operations, or obtaining any image, photographing or recovering any objects, entering, or causing to enter, anything on or below the sur-

6

face of the Atlantic Ocean, otherwise interfering with operations conducted by plaintiff, or entering the wreck site for any purpose not approved by R.M.S. Titanic, Inc., within a ten (10) mile radius of the following coordinates:

Longitude: 41 degrees 43 minutes North
Latitude: 49 degrees 56 minutes West

until further order of Court.

In entering the injunction, the court reasoned that "allowing another `salvor' to take photographs of the wreck and wreck site is akin to allowing another salvor to physically invade the wreck and take artifacts themselves."

In the spring of 1998, Deep Ocean Expeditions ("DOE"), a British Virgin Islands corporation headquartered on the Isle of Man, Great Britain, began marketing an expedition dubbed "Operation Titanic," planned for August 1998, that would allow members of the public to visit the wreck of the Titanic. The expedition was to be conducted with the assistance of the P.P. Shirshov Institute of Oceanology of the Russian Academy of Sciences in Moscow, using its research ship, the R/V Akademik Keldysh, and one of its two deep-sea submersibles, Mir 1 or Mir 2. The Russian submersibles had conducted numerous earlier dives to the Titanic. DOE announced the cost of participating at $32,500 per person. One of the subscribers was Christopher S. Haver, an Arizona resident.

When RMST learned that DOE's "Operation Titanic" would result in persons' viewing and photographing the Titanic wreck, RMST filed another motion for a preliminary injunction in this action to prevent DOE, among others, from visiting and photographing the wreck site. At the same time, Haver filed a separate action against RMST seeking a declaratory judgment that he had a right to enter the wreck site to observe, video, and photograph the Titanic. RMST filed a counterclaim in Haver's action, requesting a preliminary injunction to prohibit him from visiting the site. The district court consolidated Haver's action with the ongoing in rem action and conducted a hearing in the consolidated action on May 27, 1998. While Haver thus appeared by filing his own action to challenge the district court's

7

jurisdiction over the wreck and the wreck site of the <u>Titanic</u>, as well as the court's personal jurisdiction over him, DOE did not appear, having not been served with any process.

Following the hearing, the district court disposed of all the issues before it in an order dated June 23, 1998. On the challenge to its exercise of <u>in rem</u> jurisdiction over the <u>Titanic</u>, the district court observed that while "[i]t is undisputed that the wreck lies in international waters . . . and no state may exercise sovereignty over any part of the high seas, . . . these rules must be harmonized with the internationally recognized rules of salvage." <u>Titanic II</u>, 9 F. Supp.2d at 634. Observing that "internationally recognized principles governing salvage on the high seas encourage the exercise of <u>in rem</u> jurisdiction over a wreck site to facilitate the salvage operation itself," the court affirmed its exercise of "constructive <u>in rem</u> jurisdiction over the <u>R.M.S. Titanic</u> wreck site to facilitate RMST's salvage operations .. . under international law." <u>Id.</u> In reaching this conclusion, the court explained:

> It is in the interest of the whole world to have salvage claims decided in a single forum so that multiple, conflicting litigation is avoided. The whole world is placed on notice of the action in this Court by the publication of notice of the <u>in rem</u> arrest. Moreover, the recognized international rights at stake are minimally infringed upon. Restricting freedom of navigation over a few square miles of the vast North Atlantic Ocean is hardly a significant intrusion.

<u>Id.</u> at 634-35.

The district court also rejected Haver's claims that the court did not have personal jurisdiction over him and that a new complaint for a preliminary injunction needed to be filed and served on him. The court noted that Haver consented to the court's jurisdiction by filing a declaratory judgment action raising the same issues affirmatively asserted by RMST. <u>See id.</u> at 635.

The district court then addressed the merits of the question of whether RMST, as salvor-in-possession, had the right to exclude others from visiting the wreck site to photograph the wreck. In justifying the entry of the injunction, the court relied upon general safety con-

8

cerns caused by the depth and darkness of the North Atlantic waters around the wreck site, the need to protect RMST's substantial investment to date in salvaging the Titanic, and the public's interest in preventing unorganized, piecemeal salvaging of the Titanic, a shipwreck of great historical significance. See id. at 635-36. The court also observed that those enjoined by its order from personally viewing the Titanic could enjoy future television broadcasts of RMST's salvage efforts. See id. at 638. Accordingly, the court enjoined not only DOE and Haver, but also "anyone else having notice" from obtaining any image, video or photograph of the wreck or the wreck site and from "entering or causing anyone or anything to enter the wreck or the wreck site with the intention of performing any of the foregoing enjoined acts." Id. at 640. The court defined the wreck site as encompassing a 168 square mile area of the North Atlantic surrounding the wreck of the Titanic. See id. The injunction, by its terms, was to remain in effect "[u]ntil further order of this Court." Id.

From the district court's June 23, 1998 order, Haver filed this appeal. While DOE was not made a party to the litigation below, it too appealed because the injunction entered by the district court was specifically directed against it.

II

We resolve first the threshold question of whether DOE, who was not a party to the proceeding in the district court, may appeal the June 23, 1998 order enjoining it from visiting and photographing the Titanic. RMST contends that because DOE was a "non-party" in the action below, its appeal should be dismissed because "[n]on-parties have no right to appeal."

In the district court, RMST requested a preliminary injunction against DOE, arguing that DOE was subject to the jurisdiction of the court. It maintained that DOE had personal notice of the motion because RMST had made telephone calls to DOE's principal at his home in Germany informing him of the motion and because RMST served a copy of the motion on DOE's counsel in Washington, D.C. Despite this notice, DOE elected not to appear at the hearing. Because of DOE's failure to appear in the district court, RMST argues that DOE now has no right to appeal.

9

Consistent with its position that the district court lacked personal jurisdiction over it, DOE maintains that it did not appear because it was never served with process and, in any event, would not be subject to service of process. It notes, however, that because the court nevertheless granted RMST's motion and issued the June 23, 1998 preliminary injunction specifically "against Christopher Haver, Deep Ocean Operators [DOE]," and other related companies and persons, including DOE's principal, it is entitled to challenge the ruling.

This sequence of events reveals an inconsistency in RMST's position. RMST maintained that the district court had the power to enjoin DOE, and yet, after it successfully persuaded the court to do just that, it takes the position that DOE may not challenge entry of the injunction because DOE elected not to appear before the district court. We believe that this position is untenable.

Due process dictates and principles of fairness counsel that DOE be given an opportunity to challenge the district court's assertion of jurisdiction over it, particularly when the court specifically entered an injunction against DOE. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 110-12 (1969). In Hazeltine, the Supreme Court permitted Hazeltine, the non-party parent company of the named counter-defendant, to challenge a money judgment and an injunction entered against it by the district court even though it was not a party to the district court's proceedings. The Supreme Court had little difficulty concluding that although Hazeltine's subsidiary had entered a pretrial stipulation in the district court that Hazeltine and its subsidiary were to be considered as one entity for purposes of the litigation, "this fact cannot [now] foreclose Hazeltine, which has never had its day in court" from being heard on that issue. Id. at 111. Likewise, we conclude that DOE should not be foreclosed from being heard on its jurisdictional challenge and that therefore it properly invoked 28 U.S.C. § 1292(a) to appeal the district court's jurisdiction to enter a preliminary injunction against it.

III

Also as a threshold question, we must determine whether a live case or controversy within the meaning of Article III of the Constitution remains, given the parties' representation to us at oral argument

10

that Operation Titanic, the expedition prompting the district court's June 1998 order, took place in the fall of 1998. Accordingly, we must determine whether any decision by us today will make a difference to the parties by affording meaningful relief. See Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992) ("It has long been settled that a federal court has no authority `to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue before it'" (quoting Mills v. Green, 159 U.S. 651, 653 (1895))).

The conflict between DOE's intention to continue its business as advertised and the scope of the district court's injunction protecting RMST indicates that a live controversy between the parties remains. Both in its brief and at oral argument, DOE expressed its intention to continue to undertake expeditions to the Titanic in the near future, and we have no reason to doubt its capacity to do so. Because the district court's injunction continues to preclude DOE from making any trips "[u]ntil further order from this Court," Titanic II, 9 F. Supp.2d at 640, a live controversy exists.

IV

Beyond these threshold questions of justiciability, both DOE and Haver challenge the district court's personal jurisdiction over them.

The district court justified its jurisdiction to enter an injunction against DOE because it had, what it called, "constructive in rem jurisdiction over the wreck itself based on the presence within the judicial district of physical items salvaged from the wreck." Titanic II, 9 F. Supp.2d at 632. Believing that United States district courts have jurisdiction to adjudicate salvage claims for wrecks in international waters, the district court concluded that the proper administration of a salvage claim required it to take in rem jurisdiction over the Titanic wreck in international waters and, with that jurisdiction, to "protect the salvor in possession when it is impossible to bring the entire wreck into the judicial district at a single point in time." Id. at 633. "Since the salvor is still performing salvage operations," the court reasoned, "the in rem case is still pending, and an injunction may properly issue pursuant to the Federal Rules of Civil Procedure." Id. at 635. The court thus concluded that its "constructive in rem jurisdic-

11

tion" authorized it to enjoin DOE and others against interfering with the salvor's ongoing operations and that this authority extended against the "whole world." Id. at 634. The court explained:

> If notice is provided in a newspaper of general circulation, the whole world, it is said, are parties in an admiralty cause; and, therefore, the whole world is bound by the decision.

Id. (omitting internal quotation marks and citations). The court added that accordingly, "[a]ny current claim of ignorance to the in rem salvage action is necessarily foreclosed." Id.

In addition to the grounds advanced by the district court, RMST argues on appeal that not only does the district court have "the ability to enter orders against the whole world . . . based on its quasi in rem jurisdiction[1] over the wreck and wreck site," it also has the authority to exercise jurisdiction over "anyone who aids and abets Haver . . . in violating its orders." RMST contends that by agreeing to take Haver to the site, DOE was aiding Haver in violating the district court's injunction. Therefore, in RMST's view, because the district court had jurisdiction over Haver, it also had jurisdiction over DOE.

DOE maintains that the district court cannot enter an injunction against it without having personal jurisdiction over it and that in this case the court never obtained personal jurisdiction over it because: (1)

_____

[1] RMST's invocation of "quasi in rem" jurisdiction appears to be misplaced. Quasi in rem jurisdiction is invoked as an interim step to obtain in personam jurisdiction. See Shaffer v. Heitner, 433 U.S. 186, 196 (1977). To be sure, in Shaffer, the Court stated that in a quasi in rem action, the "only role played by the property is to provide a basis for bringing the defendant into court." Id. at 209. Articulating the role of quasi in rem jurisdiction, the Federal Rules of Civil Procedure state that when a complaint names a defendant who cannot be found within the district, property of the defendant within the district may be seized either to compel the defendant's appearance or to give effect to the relief requested in the complaint. See Fed. R. Civ. P. Supp. R. E(4). This case has little to do with quasi in rem jurisdiction because the wreck of the Titanic lies outside the district court's territorial jurisdiction. The proper inquiry here is whether a court in admiralty can award salvage rights in a shipwreck outside of United States' territorial waters.

12

a complaint against it was never filed as required by Federal Rule of Civil Procedure 3; (2) it was never served with a complaint and a summons or other process; and (3) such service, if made, would be ineffective because there is no authority for "worldwide service of process in admiralty cases . . . even if there were a constitutionally sufficient relationship between [DOE] and the forum."

Haver also challenges the district court's personal jurisdiction over him, arguing that he was never made a party to the in rem action initiated by RMST and that his separate declaratory judgment action was improperly consolidated with the in rem action to make him a party.

A

To resolve this jurisdictional dispute, we must first emphasize the distinction between in personam jurisdiction and in rem jurisdiction. While actions based on both types of jurisdiction are grounded on the principle that "every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory," Pennoyer v. Neff, 95 U.S. 714, 722 (1877), "[a]ctions in rem are prosecuted to enforce a right to things," whereas "actions in personam are those in which an individual is charged personally." The Sabine, 101 U.S. 384, 388 (1879) (emphasis added). Because in rem actions adjudicate rights in specific property before the court, judgments in them operate against anyone in the world claiming against that property. See The Moses Taylor, 71 U.S. (4 Wall.) 411, 427 (1866) (describing in rem jurisdiction and stating that "[i]t is this dominion of the suit in admiralty over the vessel or thing itself which gives to the title made under its decrees validity against all the world"); see also Darlak v. Columbus-America Discovery Group, Inc., 59 F.3d 20 (4th Cir. 1995). Consequently, judgments in in rem actions affect only the property before the court and possess and carry no in personam significance, other than to foreclose any person from later seeking rights in the property subject to the in rem action. See Pennoyer, 95 U.S. at 724. The court's authority to exercise in rem jurisdiction does not carry with it a concomitant, derivative power to enter ancillary in personam orders. See The Sabine, 101 U.S. at 388.

In personam actions, on the other hand, adjudicate the rights and obligations of individual persons or entities. It is well established that

13

due process precludes courts from adjudicating in personam the rights or obligations of persons in the absence of personal jurisdiction. See Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co. Ltd. , 484 U.S. 97, 104 (1987); Zenith Corp., 395 U.S. at 110; Koehler v. Dodwell, 152 F.3d 304, 306-07 (4th Cir. 1998). To obtain personal jurisdiction over a defendant, a court must have (1) proof of "notice to the defendant," (2) "a constitutionally sufficient relationship between the defendant and the forum," and (3) "authorization for service of a summons on the defendant." Omni Capital, 484 U.S. at 104; ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997).

Injunctive relief, by its very nature, can only be granted in an in personam action commenced by one party against another in accordance with established process. Consequently, a party cannot obtain injunctive relief against another without first obtaining in personam jurisdiction over that person or someone in legal privity with that person. See Fed. R. Civ. P. 65(d).

By contrast, injunctive relief ordered in an in rem action would be meaningless because things or property cannot be enjoined to do anything. Likewise, personal jurisdiction need not be exercised in a pure in rem proceeding because, in the simplest of terms, a piece of property and not a person serves as the defendant. See The Moses Taylor, 71 U.S. at 431 ("The distinguishing and characteristic feature of . . . [an in rem] suit is that the vessel or thing proceeded against is itself seized and impleaded as the defendant, and is judged and sentenced accordingly"). In rem actions only require that a party seeking an interest in a res bring the res into the custody of the court and provide reasonable, public notice of its intention to enable others to appear in the action to claim an interest in the res. See Roller v. Holly, 176 U.S. 398, 403-06 (1900); see also Fed. R. Civ. P. Supp. R. C(4) (requiring public notice as part of an in rem admiralty proceeding).

Thus, when DOE and Haver argue that the district court lacked personal jurisdiction over them, they do not, of necessity, challenge RMST's status as exclusive salvor, and their personal jurisdiction challenge has no implication for the validity of the in rem proceedings or the order entered in 1994 awarding RMST its status as exclusive salvor of the wreck Titanic. DOE's challenge aims solely at the dis-

14

trict court's authority to enter an <u>in personam</u> order against it absent personal jurisdiction over it.

B

Turning now to consider these requirements in the present context, it becomes readily apparent that the district court did not obtain <u>in personam</u> jurisdiction over DOE. While the district court had subject matter jurisdiction over this admiralty action, <u>see</u> 28 U.S.C. § 1333, this did not give it authority to issue process for extraterritorial service on DOE. Moreover, it is undisputed that RMST did not actually file a complaint against DOE, nor did it purport to serve DOE with any process. RMST's process consisted merely of filing a motion for preliminary injunction against DOE in the pending <u>in rem</u> action, to which DOE had never been made a party, and giving DOE informal notice of the motion's pendency.

DOE is a British Virgin Islands corporation with its principal place of business on the Isle of Man in Great Britain. Its principal resides in Germany where he concededly received notice by telephone of RMST's motion for preliminary injunction. DOE's counsel in Washington, D.C. also received a copy of the motion. In addition, constructive notice of the underlying <u>in rem</u> proceeding had been provided in 1993 through publication in <u>The Virginian-Pilot</u>, <u>The Wall Street Journal</u>, and <u>The Journal of Commerce</u>. Thus, there can be no dispute that DOE had actual notice of RMST's motion for an injunction. But this does not alone meet the formal requirements for obtaining personal jurisdiction over DOE.

Because DOE did not appear in the district court either in 1994 to claim an interest in the wreck of the <u>Titanic</u> or in 1998 to challenge RMST's motion for a preliminary injunction, it did not voluntarily subject itself to the court's jurisdiction. Further, there is no evidence in the record at this point to suggest that DOE conducts any business in the United States. Its operations are conducted in Great Britain, and the expeditions it would be conducting to the <u>Titanic</u> would take place in international waters. It does, however, market its expedition in the United States through United States corporations. Indeed, it appears that through those marketing efforts, Haver learned of the expedition and subscribed to participate in it.

15

Whether DOE's contacts with the United States would justify service of process pursuant to Federal Rule of Civil Procedure 4(k) to obtain personal jurisdiction cannot be determined on this record. But it is clear that process against DOE never issued, nor was service of process ever attempted. As we have noted, while a district court having jurisdiction over a res is entitled to adjudicate salvage rights with respect to the res, when enforcing orders to give effect to those rights against a third party who, through conduct, challenges them, the court must obtain in personam jurisdiction over the third party through the service of process. Because such process was neither issued nor served on DOE in this case, the injunction against DOE must be vacated for lack of personal jurisdiction.

We also note that DOE's agreement to take Haver on an expedition to the Titanic does not place DOE in privity with Haver to entitle RMST to rely on jurisdiction over Haver to reach DOE. See Fed. R. Civ. P. 65(d). There is no evidence from which to infer that DOE conspired with or encouraged Haver to violate the district court's injunction, nor is there evidence that Haver actually violated its injunction.

C

As for Haver, we find his challenges to the district court's personal jurisdiction over him without merit. It is true that process did not issue from the in rem action to make Haver a party to that action. But that would not be otherwise, because the in rem action only addressed rights to the res of the Titanic wreck. And in challenging the district court's personal jurisdiction over him, Haver has asserted no right to the res.

Significantly, however, Haver commenced his own in personam action against RMST, seeking a declaratory judgment that, notwithstanding the August 1996 injunction entered in the in rem action, he was entitled "to enter the site of, and to observe, photograph, and videotape, the wrecked vessel R.M.S. Titanic." RMST filed a counterclaim against Haver in the declaratory judgment action seeking an injunction against him in that action just as it was seeking in the in rem action. Thus, Haver was a party to an action in which injunctive relief against him was sought.

16

The district court consolidated Haver's declaratory judgment action with the pending in rem action by order dated May 12, 1998. In its consolidation order, the district court stated that the in personam action "will no longer exist as a separate case." This consolidation was well within the district court's discretion. See Fed. R. Civ. P. 42(a) (authorizing consolidation of "actions involving a common question of law or fact"); see also Fed. R. Civ. P. 9(h) (authorizing unified actions but preserving, within actions, the nature of maritime claims).

By filing an in personam action in the district court seeking a declaratory judgment, Haver consented to the district court's personal jurisdiction over him, and RMST's counterclaim was part of that action. See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982) (stating that an individual submits to a court's jurisdiction by appearance). When the district court granted RMST's motions for injunctive relief, which were filed both in the in rem action and in Haver's action and later consolidated, Haver was a party. By consolidating the cases, the court surely did not relinquish its jurisdiction over Haver.

In short, Haver was properly before the district court as a party, and the district court had in personam jurisdiction to enter a preliminary injunction against him.

V

Because the district court had personal jurisdiction over Haver, we must address his claim that the district court could not have exercised jurisdiction over the wreck and the wreck site of the Titanic because the wreck lay in international waters. Haver maintains that while the presentation of a wine decanter and other artifacts from the wreck to the district court in the Eastern District of Virginia might have enabled the district court to exercise in rem jurisdiction over those artifacts, there exists no principle that authorized the district court to exercise in rem jurisdiction over the wreck itself which is beyond the territorial waters of the United States. Without in rem jurisdiction, Haver argues, the district court had no power to adjudicate salvage rights and therefore had no power to enter an injunction giving effect to salvage rights.

17

Any analysis regarding the authority of a United States court to adjudicate salvage rights in shipwrecks in international waters requires inquiry first into several fundamental principles of admiralty: (1) the nature and scope of admiralty jurisdiction, (2) the applicability of salvage law as part of the common law of maritime nations, i.e., the jus gentium, and (3) the reach of an admiralty court's in rem jurisdiction. Only after we have explicated these principles can we address the existence and scope of authority of a United States court over the Titanic.

A

Article III of the Constitution extends the judicial power of federal courts to "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. And Congress implemented Article III by conferring on district courts exclusive, original jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction" and "[a]ny prize brought into the United States and all proceedings for the condemnation of property taken as prize." 28 U.S.C. § 1333. Maritime law was placed under national control "because of its intimate relation to navigation and to interstate and foreign commerce." Panama R.R. Co. v. Johnson, 264 U.S. 375, 386 (1924).

The body of admiralty law referred to in Article III did not depend on any express or implied legislative action. Its existence, rather, preceded the adoption of the Constitution. It was the well-known and well-developed "venerable law of the sea" which arose from the custom among "seafaring men," see United States v. W. M. Webb, Inc., 397 U.S. 179, 191 (1970), and which enjoyed "international comity," see The Belgenland, 114 U.S. 355, 363 (1885). Nations have applied this body of maritime law for 3,000 years or more. Although it would add little to recount the full history here, we note that codifications of the maritime law have been preserved from ancient Rhodes (900 B.C.E.), Rome (Justinian's Corpus Juris Civilis) (533 C.E.), City of Trani (Italy) (1063), England (the Law of Oleron) (1189), the Hanse Towns or Hanseatic League (1597), and France (1681), all articulating similar principles. And they all constitute a part of the continuing maritime tradition of the law of nations -- the jus gentium.

The framers drafted Article III with this full body of maritime law clearly in view. This is not to say that the Constitution recognized an

18

overarching maritime law that was to bind United States courts. On the contrary, the Constitution conferred admiralty subject matter jurisdiction on federal courts and, by implication, authorized the federal courts to draw upon and to continue the development of the substantive, common law of admiralty when exercising admiralty jurisdiction. See The Lottawanna, 88 U.S. 558, 572-78 (1874); see also 1 Benedict on Admiralty § 105, at 7-11 (7th ed. 1998). As Chief Justice Marshall observed:

> A case in admiralty does not, in fact, arise under the Constitution or laws of the United States. These cases are as old as navigation itself; and the law, admiralty and maritime, as it has existed for ages, is applied by our Courts to the cases as they arise.

The American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 544-45 (1828).

Since the Founding, federal courts sitting in admiralty jurisdiction have steadfastly continued to acquiesce in this jus gentium governing maritime affairs. Indeed, the Supreme Court has time and again admonished that "courts of this and other commercial nations have generally deferred to a non-national or international maritime law of impressive maturity and universality." Lauritzen v. Larsen, 345 U.S. 571, 581 (1953); see also United States v. W.M. Webb, Inc., 397 U.S. at 191 (1970) (observing that the "[m]aritime law . . . provides an established network of rules and distinctions that are practically suited to the necessities of the sea"). This body of maritime law "has the force of law, not from extraterritorial reach of national laws, nor from abdication of its sovereign powers by any nation, but from acceptance by common consent of civilized communities of rules designed to foster amicable and workable commercial relations." Larsen, 345 U.S. at 581-82. Thus, when we say today that a case in admiralty is governed by the general maritime law, we speak through our own national sovereignty and thereby recognize and acquiesce in the time-honored principles of the common law of the seas. See Ex Parte Western Maid, 257 U.S. 419, 432 (1922).

The exercise of admiralty subject matter jurisdiction has never been limited to maritime causes arising solely in the United States ter-

19

ritorial waters. On the contrary, maritime causes arising from matters on the high seas anywhere in the world have traditionally been brought to courts of admiralty, subject only to a discretionary exercise of the doctrine of forum non conveniens. See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 218-19 (1986); see also Mason v. Ship Blaireau, 6 U.S. (2 Cranch) 240 (1804); The Belgenland, 114 U.S. at 362-63 (in rem admiralty jurisdiction proper in action arising out of collision on the high seas between two foreign vessels); Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel, 640 F.2d 560, 567 (5th Cir. 1981) ("Since the admiralty jurisdiction of United States courts is not limited by the nationality of ships, sailors or seas involved and since the principles of the law of salvage are part of the jus gentium, i.e., the international maritime law, United States courts have long adjudicated salvage claims involving foreign vessels, alien salvors and salvage operations occurring on the high seas"); Grant Gilmore & Charles Black, Jr., The Law of Admiralty § 1-19, at 51-52 (2d ed. 1975) (stating that "[t]he courts of the United States take jurisdiction, subject to some reservations imposed by their own application of the doctrine of forum non conveniens, of suits on maritime claims arising out of transactions and occurrences anywhere in the world" (footnotes omitted)).

Even though admiralty courts may adjudicate matters arising on navigable waters anywhere in the world, that recognition of subject matter jurisdiction does not imply that American courts in admiralty have the power to command that any person or any ship appear before a United States court sitting in admiralty. Stated differently, Article III of the Constitution and 28 U.S.C. § 1333 do not amount to an attempt by the United States to extend its sovereignty over persons (in personam) or things (in rem) beyond the territorial limits of the United States. While we note this important distinction between a broad subject matter jurisdiction and the limitation imposed by territorial jurisdiction, we discuss the territorial limitation in more detail, below.

B

The general maritime law of nations includes a law of finds and a law of salvage, and courts of admiralty apply one to the exclusion of the other, as appropriate, to resolve claims in property discovered and

20

recovered in navigable waters by those other than the property's owners or those taking through them. See Columbus-America Discovery Group v. Atlantic Mut. Ins. Co., 974 F.2d 450, 459-60 (4th Cir. 1992). Under the law of finds, a person, who discovers a shipwreck in navigable waters that has been long lost and abandoned and who reduces the property to actual or constructive possession, becomes the property's owner. See Martha's Vineyard Scuba Headquarters, Inc. v. The Unidentified, Wrecked and Abandoned Steam Vessel, 833 F.2d 1059, 1065 (1st Cir. 1987); Hener v. United States, 525 F. Supp. 350, 354-57 (S.D.N.Y. 1981) (cited and quoted with approval in Columbus-America Discovery, 974 F.2d at 460).

Because the law of finds deprives the true owner of a property right, the courts of admiralty disfavor its application and prefer to apply the law of salvage in its stead. They have reasoned that the law of salvage better serves the needs of maritime commerce by encouraging the saving of property for the benefit of its owner rather than the secretive discovery of property in an effort to deprive the owner of title. See Columbus-America Discovery, 974 F.2d at 464; Hener, 525 F. Supp. at 354 ("salvage law assumes that the property being salved is owned by another, and thus that it has not been abandoned"). Accordingly, the law of finds is most often applied in the context of long-lost shipwrecks. See, e.g., Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel, 569 F.2d 330, 337 (5th Cir. 1978) (applying the law of finds to the recovery of a Spanish vessel which sunk near the Florida Keys in 1622, stating that "disposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches the fiction to absurd lengths"); see also 3A Benedict on Admiralty § 158, at 11-17 (7th ed. Supp. 1991) (recommending "limit[ing] the doctrine of `find' relative to marine disasters to long-lost wrecks . .. or where the owners of maritime properties have publicly abandoned them" (footnote omitted)). Neither the parties nor the district court has urged the application of the law of finds in this case, leaving for application the law of salvage.

The principles of salvage law are intended to encourage persons to render prompt, voluntary, and effective service to ships at peril or in distress by assuring them compensation and reward for their salvage efforts. See The Akaba, 54 F. 197, 200 (4th Cir. 1893). Absent the

21

promise of compensation and reward, we question whether a party, even one with the capacity to save the Titanic itself, would incur the costs to do so. See M/V JA Orgeron, 143 F.3d at 986 n.12 (observing that "if the costs of performing a salvage are too high or the benefits to be derived are too low, the parties might well agree to call it a day and let the sea claim its prize"); see also William M. Landes & Richard A. Posner, Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism, 7 J. Leg. Stud. 83, 100 (1978) (arguing that the law of salvage exists to "encourage rescues in settings of high transaction costs by simulating the conditions and outcomes of a competitive market").

The policies of salvage law have existed as an important part of the general maritime law of nations as long as there has been navigation. See M/V JA Orgeron, 143 F.3d at 985 ("This simple rule has been an integral part of maritime commerce in the western world since the western world was civilized"). Indeed, the 3,000-year old Rhodian Code provided:

> Article XLV. "If a ship be surprised at sea with whirlwinds, or be shipwrecked, any person saving anything of the wreck, shall have one-fifth of what he saves."

Reprinted in 3A Benedict on Admiralty § 5, at 1-8. And as to salvage from shipwrecks, the Rhodian Code provided:

> Article XLVII. "If gold, or silver, or any other thing be drawn up out of the sea eight cubits deep, he that draws it up shall have one-third, and if fifteen cubits, he shall have one-half, because of the depth."

Id. The Code also provided that those illegally pillaging a wreck would be required to restore fourfold. See id. The same principles of salvage were included in the Law of Oleron, codified about 2,000 years after the Rhodian Law and adopted in England in the 12th century. See id. § 8, at 1-11. And they continue to apply as part of the jus gentium today. See, e.g., International Convention on Salvage, April 29, 1989, preamble (providing that international salvage law should "ensure that adequate incentives are available to persons who undertake salvage operations in respect of vessels and other property

22

in danger"); see also United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1245, 1326 art. 303 (providing that the Convention respects "the rights of identifiable owners, the law of salvage or other rules of admiralty").**2**

When providing salvage service, a salvor acts on behalf of the owner in saving the owner's property even though the owner may have made no such request or had no knowledge of the need. The law of salvage presumes that the owner desires the salvage service. And it is the assurance of compensation and reward that provides the "inducement to seamen and others to embark in such undertakings to save life and property." The Blackwall, 77 U.S. 1, 14 (1870) (citation omitted). As the Court in Blackwall explained, "Public policy encourages the hardy and adventurous mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation." Id. (footnote omitted). If the salvor fails in his salvage efforts, however, he can claim no compensation or reward.

To establish a salvage claim for compensation and award, a person must demonstrate (1) that he has rendered aid to a distressed ship or its cargo in navigable waters; (2) that the service was voluntarily rendered without any preexisting obligation arising from contract or otherwise to the distressed ship or property; and (3) that the service was useful by effecting salvage of the ship or its cargo, in whole or in part. See The Sabine, 101 U.S. 384, 384 (1879); Brown v. Johansen, 881 F.2d 107, 109 (4th Cir. 1989).

Upon rendering salvage service, a salvor obtains a lien in the saved property by operation of law to secure payment of compensation and award due from the property owner. See The Sabine, 101 U.S. at 386; see also Amstar Corp. v. S/S Alexandros T., 664 F.2d 904, 909 (4th Cir. 1981). This lien attaches to the property to the exclusion of all others, including the property's true owner. And to facilitate enforcement of the lien, the salvor enjoys a possessory interest in the prop-

_____

**2** Although the United States signed the United Nations Convention in 1994, the Senate has not yet provided the necessary advice and consent for ratification.

23

erty until the salvor is compensated. See S/S Alexandros T., 664 F.2d at 908-09. Because the salvor's lien is exclusive and prior to all others, so too, the salvor's possessory interest in the res is enjoyed to the exclusion of all others, including the res' true owner.

By rendering salvage service, the salvor thus acquires a limited property interest in the goods saved -- a first lien and exclusive possession -- until the salvor has been paid or his right against the property has been enforced. See The Emblem, 8 F. Cas. 611, 614 (D. Me. 1840); 3A Benedict on Admiralty § 143, at 10-8 (quoting The Emblem). While this interest attaches only to saved property, to protect a salvor's general salvage rights, a court of admiralty will protect the inchoate right of salvors in yet-to-be salved property for a reasonable period. See Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel, 546 F. Supp. 919, 929 (S.D. Fla. 1981).

Although a salvor may enforce its claim for salvage service by filing an in personam action against the owner, the salvor may also execute on the lien which attached to the ship and its cargo by filing an in rem action. The lien can be enforced only through the institution of an in rem action, and the admiralty court exercises in rem jurisdiction only to enforce a maritime lien. Thus, "[t]he lien and the proceeding in rem are . . . correlative - where one exists, the other can be taken, and not otherwise." S/S Alexandros, 664 F.2d at 909 (internal quotation marks omitted); see also Fed. R. Civ. P. Supp. R. C(1). To execute on the lien, the court may order the sale of the property, or, if a sale would yield an amount insufficient to fund an award to the salvor, the court may transfer title to the property to the salvor.

While the law of salvage provides substantial protection to salvors to encourage their saving of life and property at sea, it also imposes duties of good faith, honesty, and diligence in protecting the property in salvors' care. Thus, salvors have to exercise a trust over the property for the benefit of the owner and subject to any orders of a court. See The Barque Island City, 66 U.S. (1 Black) 121 (1861). In this vein, salvors are not entitled to remove property from the wreck for their own use or to use the property for their own use. When a violation of this trust occurs, the salvage claim is forfeited. See Danner v. United States, 99 F. Supp. 880 (S.D.N.Y. 1951). Indeed, it has been

24

held that even when salvors have mistakenly misunderstood their rights and have taken property for their own use, they forfeited their right to a salvage award. See, e.g., id.; see also The Mable, 61 F.2d 537, 540 (9th Cir. 1932).

C

An in rem action, which is the most common process for enforcing a claim for salvage service, depends on the court's having jurisdiction over the res, the property which is named as defendant. See Pennoyer, 95 U.S. at 724. Only if the court has exclusive custody and control over the property does it have jurisdiction over the property so as to be able to adjudicate rights in it that are binding against the world. See Darlak v. Columbus-America Discovery Group, Inc., 59 F.3d 20, 22-23 (4th Cir. 1995). Accordingly, to exercise in rem jurisdiction over a ship or its cargo, the ship or cargo must be within the district in which the in rem complaint is filed. See The Brig Ann, 13 U.S. (9 Cranch) 289, 291 (1815); see also Platoro Ltd., Inc. v. The Unidentified Remains of a Vessel, 695 F.2d 893 (5th Cir. 1983); see also Fed. R. Civ. P. Supp. R. E(3) (providing that process in rem may only be served within the district).

While the res must be in custodia legis (in the court's possession), this possession may be actual or constructive. See The Brig Ann, 13 U.S. at 291. Constructive possession connotes something less than physical seizure of a res by a court. Just last term, for instance, the Supreme Court implicitly recognized the propriety of a district court's exercise of in rem admiralty jurisdiction over a shipwreck in California's territorial waters after a salvor presented "china, a full bottle of champagne, and a brass spike from the ship's hull" to the district court. See California v. Deep Sea Research, Inc., 118 S. Ct. 1464, 1467 (1998). The propriety of exercising in rem jurisdiction over an entire ship wreck within the court's territorial jurisdiction when only part of that wreck is actually presented to a court rests upon the fiction that the res is not divided and that therefore possession of some of it is constructively possession of all. See id. at 1473.

But when the res is not in the court's actual or constructive possession, traditional principles of in rem jurisdiction dictate that the court may not adjudicate rights to the res and effectively bind others who

25

may have possession. See Pennoyer, 95 U.S. at 724; see also Fed. R. Civ. P. Supp. R. E(3). Consequently, a court could not exercise in rem jurisdiction, as traditionally understood, so as to vest rights in property outside of its territory, such as in a shipwreck lying in international waters. This conclusion is compelled by a recognition of the sovereign limits of the United States and the open nature of the high seas.

The sovereign limits of a nation are defined by those territorial boundaries within which it exercises supreme and exclusive power. Where a nation has boundaries contiguous to the high seas, international law defines the nation's sovereign limits by dividing navigable waters generally into three categories "distinguished by the nature of the control which the contiguous nation can exercise over them." United States v. Louisiana, 394 U.S. 11, 22 (1969) (footnote omitted).

Navigable waters that lie inland of a nation's borders are within the nation's complete control as with any real property within its borders. See id.; see also The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) (stating that the "jurisdiction of the nation within its own territory is necessarily exclusive and absolute"). Likewise within the general sovereign sphere of a nation are its territorial waters, defined as those navigable waters lying up to 12 nautical miles beyond a nation's shoreline. See United States v. California, 332 U.S. 19, 35 (1947) (stating that the extension of our territorial jurisdiction "is but a recognition of the necessity that a government next to the sea must be able to protect itself from dangers incident to its location"). And beyond the territorial waters lie the high seas, over which no nation can exercise sovereignty. See Louisiana, 394 U.S. at 23; see also United States v. Louisiana, 363 U.S. 1, 33-34 (1960) (stating that the "high seas, as distinguished from inland waters, are generally conceded by modern nations to be subject to the exclusive sovereignty of no single nation"); California, 332 U.S. at 34 (stating that the United States, "throughout its existence has stood for freedom of the seas, a principle whose breach has precipitated wars among nations"); The Vinces, 20 F.2d 164, 172 (E.D.S.C. 1927) (stating that the high seas "are the common property of all nations"). The mutual access to the high seas is firmly etched into the jus gentium. See, e.g., United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1245, 1286-87 arts. 87, 89 (pro-

26

viding that the high seas shall be open to all nations and that "no State may validly purport to subject any part of the high seas to its sovereignty").**3**

Any extension of jurisdiction into the high seas by a nation must be "subject to the consent of other nations." See Louisiana, 363 U.S. at 34; see also California, 332 U.S. at 35 (stating that "whatever any nation does in the open sea, which detracts from its common usefulness to nations, or which another nation may charge detracts from it, is a question for consideration among nations as such, and not their separate governmental units" (footnote omitted)). We do, however, acknowledge that the law of nations sanctions limited extraterritorial exercises of jurisdiction. See, e.g., Louisiana, 363 at 34 n.60 ("For example, the United States has long claimed the right to exercise jurisdiction over domestic and foreign vessels beyond the three-mile limit for purposes of customs control and for defense purposes and this practice is recognized by international law" (citations omitted)); Hudson & Smith v. Guestier, 10 U.S. (6 Cranch) 281, 284 (1810) (recognizing that a seizure of property on the high seas, beyond the territorial limits of all nations, for breach of a municipal revenue raising regulation is warranted by the jus gentium).

In sum, because the exercise of in rem jurisdiction depends on the court's exercise of exclusive custody and control over the res, the limits of in rem jurisdiction, as traditionally understood, are defined by the effective limits of sovereignty itself.

_____

**3** Under the 1982 United Nations Convention, an exclusive economic zone is recognized, beginning at the outer limit of the territorial waters and extending to 200 nautical miles from the nation's shoreline. Within this economic zone, a nation may exercise exclusive control over economic matters involving fishing, the seabed, and the subsoil, but not over navigation. See United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1245, 1280, arts. 56(1), 57. Even though the United States has not yet ratified this treaty, see supra note 2, it generally recognizes this 200-mile economic zone. See Thomas J. Schoenbaum, 1 Admiralty and Maritime Law, § 2-16, at 35 (2d ed. 1994) (collecting legislation enacted by Congress in accordance with the Law of the Sea Convention).

27

VI

In applying these principles to a wreck lying in international waters, obvious complexities emerge. In rem jurisdiction, which depends on sovereignty over property, cannot be given effect to property beyond a nation's boundaries of sovereignty. See Pennoyer, 95 U.S. at 722 (stating "that every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory"). Where both persons and property are beyond a nation's zone of exclusive legal power, its ability to adjudicate rights as to them is limited, but not meaningless.

When nations agree on law to apply on the high seas, they agree to an order even beyond their sovereign boundaries which, while they hope will be honored on the high seas, can only be enforced completely and effectively when the people or property are brought within a nation's zone of power -- its sovereignty.

So it must be with the Titanic. The jus gentium, the law of all maritime nations, is easy to define and declare. But its enforcement must depend on persons or property involved in such a declaration coming into the zone of power of participating nations. We now turn to observe how these intersecting principles operate in this case.

A

First, Haver presents us with no reason to upset the district court's findings that RMST (and its predecessors) represented the first party successfully to salvage the wreck of the Titanic and that RMST has continued and plans to continue its substantial efforts. As the district court recognized, salvaging the wreck of the Titanic has presented a challenge of unprecedented proportion. Because the wreck lies under 2.5 miles of water, where there is virtually no light, the water is frigid, and the water pressure beyond general comprehension, only the most sophisticated oceanographic equipment can explore the site and recover property. Doing so is time consuming, expensive, and dangerous.

Since 1993, RMST has overcome these challenges, conducting research and recovery expeditions in June 1993, July 1994, and

28

August 1996. From these expeditions, it has been able to recover over 3,600 artifacts from the wreck and to gather thousands of photographs and hundreds of hours of video footage. As the district court observed, "RMST has exhibited considerable zeal as salvor in possession despite the fact that salvaging the wreck is extremely time-consuming, dangerous, and expensive." Titanic II, 9 F. Supp.2d at 627.

As the first successful salvor, RMST obtained an inchoate lien as a matter of law in the wreck as well as the artifacts from the wreck to enforce its claim for compensation and reward. And with its lien, RMST obtained the right to exclusive possession, not only of the artifacts removed from the wreck of the Titanic, but also of the wreck itself, so that no other person is entitled lawfully to intrude as long as salvage operations continue. See Treasure Salvors, Inc., 640 F.2d at 567.

Because RMST has necessarily acted on behalf of the owners of the property even if the owners did not or could not know of RMST's efforts, its interest in the property is limited to an exclusive possessory right, not for its own use, but for the purpose of bringing the property within the jurisdiction of a court in admiralty to enforce its maritime lien securing its claim for compensation and reward. But once the property is brought in custodia legis, the court can execute on RMST's lien and sell the property, or if the sale of the property would prove insufficient to compensate RMST fairly, the court can award title in the property to RMST.

These conclusions reached by the district court about RMST's rights are consistent with the salvage law which is part of the jus gentium, and we expect that whether RMST had returned property from the Titanic to an admiralty court in England or France or Canada, the court would, by applying the same principles, have reached the same conclusions. The need for courts of admiralty to apply the law similarly is fundamentally important to international commerce and to the policies supporting order on the high seas. It is therefore prudent for us, as one such court sitting in admiralty, to assure enforcement in harmony with these shared maritime principles. And to this end, we are satisfied that to the extent the district court applied

29

these principles, it acted in accordance with the <u>jus gentium</u> in award-ing RMST exclusive salvage rights in the wreck of the <u>Titanic</u>.

B

Although the district court applied principles of the <u>jus gentium</u> to award RMST exclusive salvage rights in the <u>Titanic</u>, the question peculiar to this case remains how, if at all, can a court in admiralty enforce these salvage rights with respect to property that does not lie within its jurisdiction, nor, for that matter, within the jurisdiction of any admiralty court.

RMST argues, somewhat boldly and apparently without any direct legal authority, that an admiralty court can simply assert <u>in rem</u> juris-diction over wrecks lying in international waters, beyond the territo-rial limits of the court's jurisdiction, and enter orders to enforce that jurisdiction. But this fails to account for the limits of courts' jurisdic-tion and, indeed, the limits of national sovereignty.

<u>In rem</u> jurisdiction is traditionally justified by the presence of the <u>res</u> within the jurisdiction of the court. Having exclusive legal cus-tody over the <u>res</u>, whether actual or constructive, enables the court to issue orders respecting the <u>res</u> that are exclusive as against the whole world. With <u>in rem</u> jurisdiction, therefore, a court has the power, among others, to order the seizure, the sale, or the transfer of the <u>res</u>. It follows that when the <u>res</u> is outside the jurisdiction of the court, indeed, beyond the territorial limits of the United States, the court cannot exercise <u>in rem</u> jurisdiction over it, at least in the traditional sense.

In this case, the district court recognized this limitation and rested its authority over the wreck of the <u>Titanic</u> on what it called "construc-tive <u>in rem</u>" jurisdiction. Obviously, any power exercised in interna-tional waters through "constructive <u>in rem</u>" jurisdiction could not be exclusive as to the whole world. For example, a French court could presumably have just as well issued a similar order at the same time with no less effect. But this non-exclusive control over the <u>res</u> would not defeat the district court's first purpose of declaring salvage rights to the wreck as against the world. In fact, we believe that the <u>jus gentium</u> authorizes an admiralty court to do so, even though the

30

exclusiveness of any such order could legitimately be questioned by any other court in admiralty. The ultimate resolution could only occur at such time as property is removed from the wreck and brought within the jurisdiction of an admiralty court, giving it exclusive in rem jurisdiction over the property or when the persons involved in any dispute over the property are before the court in personam.

But this limitation on the jurisdiction exercised by the district court does not mean that its declaration with respect to the res was ineffective. We believe that the district court has a "constructive" -- to use the district court's term -- in rem jurisdiction over the wreck of the Titanic by having a portion of it within its jurisdiction and that this constructive in rem jurisdiction continues as long as the salvage operation continues. We hasten to add that as we use the term "constructive," we mean an "imperfect" or "inchoate" in rem jurisdiction which falls short of giving the court sovereignty over the wreck. It represents rather a "shared sovereignty," shared with other nations enforcing the same jus gentium. Through this mechanism, internationally recognized rights may be legally declared but not finally enforced. Final enforcement requires the additional steps of bringing either property or persons involved before the district court or a court in admiralty of another nation.

Testing the effect of a United States court's attempt to assert exclusive jurisdictional power over property located beyond the territorial limits of the United States quickly brings a pragmatic response. When a nation seeks to exert sovereignty through exclusive judicial action in international waters, the effort prompts the obvious question of how the jurisdiction is to be enforced. But even beyond this pragmatic consideration lies the yet more significant consideration that asserting sovereignty through a claim of exclusive judicial action beyond the territorial limits of a nation would disrupt the relationship among nations that serves as the enforcement mechanism of international law and custom. What would occur if an English or French court were to exercise similar power? The necessary response to probes such as these leads to the now well-established norm of international law that no nation has sovereignty over the high seas. See, e.g., United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1245, 1287 art. 89 (providing that "no state may validly purport to subject any part of the high seas to its sovereignty").

31

This conclusion that no nation has sovereignty through the assertion of exclusive judicial action over international waters does not leave the high seas without enforceable law. The law of salvage as shared by the nations as part of the jus gentium applies to the high seas, and we are satisfied that it will do no violence to the relationship among nations to enforce these rights to the extent generally recognized on a non-exclusive basis. For this reason, we conclude that the district court was correct in declaring that RMST has salvage rights in the wreck of the Titanic and that these rights include the right exclusively to possess the wreck for purposes of enforcing the maritime lien that RMST obtained as a matter of law. It also follows that the district court acted properly in entering an injunction against persons over whom it had jurisdiction, prohibiting them from interfering with the salvage efforts being pursued by RMST. We believe that these aspects of the district court's declaration and injunction would be recognized by all maritime nations and similarly be enforced by their courts.**4**

_____

**4** In reaching this conclusion, we reject Haver's argument that the R.M.S. Titanic Maritime Memorial Act of 1986, 16 U.S.C. § 450rr et seq., precluded the district court from exercising jurisdiction over the wreck of the Titanic. That statute, while recognizing the "major national and international cultural and historical significance" of the Titanic, 16 U.S.C. § 450rr(a)(3), merely exists to encourage the United States (or more specifically, the President) to coordinate cooperative international efforts "for conducting research on, exploration of, and if appropriate, salvage of the R.M.S. Titanic." 16 U.S.C. § 450rr(b)(3). The statute also specifically expresses Congress' sense that "research and limited exploration activities concerning the R.M.S. Titanic should continue for the purpose of enhancing public knowledge of its scientific, cultural, and historical significance" pending the consummation of such international efforts. 16 U.S.C. § 450rr-5.

We also refuse to construe the language in § 450rr-6 of the statute -- "By enactment of sections 450rr to 450rr-6 of this title, the United States does not assert sovereignty, or sovereign or exclusive rights or jurisdiction over, or the ownership of, any marine areas or the R.M.S. Titanic" -- as stripping the federal courts of jurisdiction over the wreck for purposes of recognizing, consistent with the jus gentium, RMST as the wreck's exclusive salvor. Read in the context of the entire R.M.S. Titanic Memorial Act, we believe that language has no bearing in this appeal.

32

But we hasten to point out, again, that the power of an American court to enforce such orders is effectively limited until persons and property are brought within its territorial jurisdiction. These are limits that any court faces, regardless of the nation involved. Shared rights to the high seas may be exercised by all nations, and the assertion by any nation of exclusive sovereignty over a portion would interfere with those rights. This notion of "shared sovereignty" does not, however, preclude all nations from enforcing the internationally recognized laws of salvage in courts with respect to persons and property within their jurisdiction, nor even from exercising this form of shared sovereignty for matters on the high seas.

If we were to recognize an absolute limit to the district court's power that would preclude it, or essentially any other admiralty court, from exercising judicial power over wrecks in international waters, then we would be abdicating the order created by the jus gentium and would return the high seas to a state of lawlessness never experienced -- at least as far as recorded history reveals. We refuse to abdicate in this manner.

VII

While we affirm the district court's order enjoining Haver from interfering with the ongoing salvage operations of RMST, we must still address the additional terms to which he objects: (1) whether salvage rights include the right to exclude others from visiting, observing, and photographing the wreck; and (2) whether, in enjoining others from interfering with the ongoing salvage operations, the district court could exclude others from an area within a 10-mile radius (the 314-square mile circular area protected by its August 1996 order) or a 168-square mile rectangular area (protected by its June 1998 order), both of which lie entirely within international waters.

The June 1998 injunction provided in pertinent part:

> Until further order of this Court, these parties[including Haver] are ENJOINED from (i) interfering with the rights of RMST, as salvor in possession of the wreck and wreck site of the R.M.S. TITANIC, to exclusively exploit the wreck and wreck site, (ii) conducting search, survey, or sal-

33

> vage operations of the wreck or wreck site, (iii) obtaining
> any image, video, or photograph of the wreck or wreck site,
> and (iv) entering or causing anyone or anything to enter the
> wreck or wreck site with the intention of performing any of
> the foregoing enjoined acts.

Titanic II, 9 F. Supp.2d at 640. This injunction was a reiteration of
the court's August 1996 injunction in which it, for the first time,
explicitly prohibited others from photographing the wreck or wreck
site of the Titanic. In entering the 1996 order, the court expanded tra-
ditional salvage rights to include the right to exclusive photographing
of the wreck and the wreck site. The court explained:

> [I]f R.M.S. TITANIC is not selling artifacts like traditional
> salvors, it must be given the rights to other means of obtain-
> ing income. The court finds that in a case such as this,
> allowing another "salvor" to take photographs of the wreck
> and wreck site is akin to allowing another salvor to physi-
> cally invade the wreck and take artifacts themselves.

The court pointed out that photographs could be marketed like any
other physical artifact and therefore that the rights to record images
of the Titanic belonged to RMST, the salvor in possession of the
wreck.

The district court's expansion of salvage rights to include the right
exclusively to photograph or otherwise record images of the wreck for
the purpose of compensating salvors for their effort is both creative
and novel. We are aware of no case in the United States or in the body
of jus gentium, however, that has expanded salvage rights to include
this type of a right. More importantly, we are not satisfied that the law
of salvage would be properly extended to give salvors exclusive
image recording rights in yet to be saved property. The underlying
policy of salvage law is to encourage the voluntary assistance to ships
and their cargo in distress. See, e.g., The Sabine, 101 U.S. 384;
Columbus-America, 974 F.2d at 459; The Akaba, 54 F. at 200.
And the salvage service is useful to owners only when it
effects a saving of the specific property at risk. The law does not
include the notion that the salvor can use the property being salvaged
for a commercial use to compensate the salvor when the property
saved might have inadequate value. Traditionally, the inducement for
salvage service is limited to the court's award of compensation and

34

reward, which may be enforced <u>in personam</u> against the owner without regard to the property saved, or <u>in rem</u> against the property saved.

To award, in the name of salvage service, the exclusive right to photograph a shipwreck, would, we believe, also tend to convert what was designed as a salvage operation on behalf of the owners into an operation serving the salvors. The incentives would run counter to the purpose of salvage. Salvors would be less inclined to save property because they might be able to obtain more compensation by leaving the property in place and selling photographic images or charging the public admission to go view it.

Even if we were to assume that the salvors had full title to the yet to be recovered shipwreck, as would be the case if the law of finds were applied, it is doubtful that such title to property lying in international waters would include the right to exclude others from viewing and photographing it while in its public site. Exclusive viewing and photographing of property is usually achieved by exercising exclusive possession and removing the property to a private or controllable location where it cannot be viewed or photographed except under conditions controlled by the owner. But a property right does not normally include the right to exclude viewing and photographing of the property when it is located in a public place.**5**

In addition, if we were now to recognize, as part of the salvage law, the right to exclude others from viewing and photographing a shipwreck in international waters, we might so alter the law of salvage as to risk its uniformity and international comity, putting at risk the benefits that all nations enjoy in a well-understood and consistently-applied body of law. This risk is heightened when it is understood that such an expansion of salvage rights might not encourage salvage and might, additionally, discourage free movement and navigation in international waters.

For these reasons, we conclude that the district court erred in extending the law of salvage to vest in RMST exclusive rights to visit, view, and photograph the wreck and wreck site of the <u>Titanic</u> at its location in international waters.

_____

**5** For instance, even under American copyright law, where an architect has a copyright in the design of a building, that right does not extend to prevent the viewing and photographing of the building, if it is located at a public site or is visible from a public place. <u>See</u> 17 U.S.C. § 120(a).

35

The district court's August 1996 injunction also prohibited anyone from entering within a 10-mile radius of the wreck site to search, survey, or obtain any image of the wreck or wreck site, and the court's June 1998 order prohibited anyone from entering, for a similar purpose, a rectangular area around the wreck site computed to be 168-square miles. Neither prohibition is justified by the law of salvage or allowed by the law of free navigation on the high seas. For the same reasons that we gave in denying exclusive viewing and photographing rights -- that to do so would alarmingly expand salvage law and interfere with the right of free navigation -- we also reverse these aspects of the district court's orders. This does not mean, however, that a court may not enforce salvage rights by prohibiting a party over whom it has personal jurisdiction from conducting salvage operations or interfering with the first salvor's exclusive possession of the wreck for purposes of salving it.

VIII

In summary, we conclude that this appeal presents us with a case or controversy as understood under Article III of the Constitution. We also consider DOE's appeal of the June 1998 injunction directed against it, even though DOE was not a party to the district court proceedings, and agree with DOE that the injunction against it is not enforceable because it was never made a party through proper service of process nor was it in privity with the party. We reject, however, Haver's personal jurisdictional challenge. With respect to Haver's challenge to the injunctions themselves, we affirm in part and reverse in part. We affirm the district court's injunctions insofar as they enjoin parties and persons in privity with them from conducting salvage operations of the Titanic wreck and interfering with the salvage operations of RMST. We reverse them insofar as they purport to prohibit the visiting, viewing, searching, surveying, photographing, and obtaining images of the wreck or the wreck site, as long as these activities do not constitute any salvage effort or interfere with RMST's salvage rights.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

36