[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-10269
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 21, 2011
JOHN LEY
CLERK

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,

Plaintiff-Appellant,

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within center point
coordinates, In Rem.

Defendant,

KINGDOM OF SPAIN,

Claimant-Appellee,

REPUBLIC OF PERU,
GONZALO DE ALIAGA,
the Count of San Juan de Lurigancho,
AGUSTIN DE ALIAGA,
the current Marques de Zalada del Fuente,
GONZALO ALVAREZ DEL VILLAR, et al.,

Claimants.

_____

No. 10-10317
_____

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,


Plaintiff,

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within
center point coordinates, In Rem,


Defendant,

GONZALO DE ALIAGA,
the Count of San Juan de Lurigancho,
AGUSTIN DE ALIAGA,
the current Marques de Zelada del Fuente,
GONZALO ALVAREZ DEL VILLAR,
IGNACIO DE COLMENARES,
the 11th Count of Polentinos,
ALBERTO EMILIO THIESSEN,
ENRIQUETA PITA DUTHURBURU,
FLORA LEONOR PERALES CALDERON DE COLMENARES,
FELIPE VOYEST,
ADELA ARMIDA DE IZCUE BAZO,
CAROLA DAIREAUX KINSKY,
ELEONORA DAIREAUX KINSKY,
MATILDE DAIREAUX KINSKY,
JULIO VEGA EURASQUIN,
INEZ MARQUEZ OSORIO,

2

JAVIER DE GOYENECHE,
the current Count of Guaqui and Marques de Villafuente,
JUAN MARIANO DE GOYENECHE Y SIL VELA,
the current Marques of Casa Davila,

Claimants-Appellants,

KINGDOM OF SPAIN,

Claimant-Appellee.

_____

No. 10-10318
_____

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,

Plaintiff,

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within
center point coordinates, In Rem,

Defendant,

ELSA DORCA WHITLOCK,
f.k.a. Elsa Dorca Ruiz,

Claimant-Appellant,

KINGDOM OF SPAIN,

Claimant-Appellee.

3

_____

No. 10-10319

_____

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,

Plaintiff,

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within
center point coordinates, In Rem,

Defendant,

REPUBLIC OF PERU,

Claimant-Appellant,

KINGDOM OF SPAIN,

Claimant-Appellee.

_____

No. 10-10320

_____

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,

Plaintiff,

4

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within
center point coordinates, In Rem,

Defendant,

SANTIAGO DE ALVEAR,
EMILIO DE ALVEAR,
MARIA EUGENIA SOLVEYRA,
ALEJANDRO JULIAN PERA BARTHE',
AGUSTINA SOLVEYRA,
IGNACIO SOLVEYRA,

Claimants-Appellants,

KINGDOM OF SPAIN,

Claimant-Appellee.

_____

No. 10-10374
_____

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,

Plaintiff,

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within
center point coordinates, In Rem,

Defendant,

DR. JAIME DURAND PALACIOS,

Claimant-Appellant,

KINGDOM OF SPAIN,

Claimant-Appellee.

————————————————

No. 10-10375

————————————————

D. C. Docket No. 8:07-cv-00614-SDM-MAP

ODYSSEY MARINE EXPLORATION, INC.,

Plaintiff,

versus

THE UNIDENTIFIED SHIPWRECKED VESSEL,
its apparel, tackle, appurtenances and cargo located within
center point coordinates, In Rem,

Defendant,

JOSE ANTONIO RODRIGUEZ-MENENDEZ,
a.k.a. Joseph Anthony Rodriguez,

Claimant-Appellant,

KINGDOM OF SPAIN,

Claimant-Appellee.

6

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(September 21, 2011)

Before HULL, BLACK and STAPLETON,[*] Circuit Judges.

BLACK, Circuit Judge:

In 2007, Odyssey Marine Exploration, Inc. (Odyssey) discovered the remains of a 19th Century Spanish vessel in international waters west of the Straits of Gibraltar. Odyssey filed a verified admiralty complaint *in rem* against the shipwrecked vessel and its cargo in the Middle District of Florida and also sought a warrant of arrest. The Kingdom of Spain (Spain), the Republic of Peru (Peru), and twenty-five individuals filed claims against the *res*. Upon receiving additional information about the vessel's identity, Spain also filed a motion to dismiss. Spain argued, without waiving its sovereign immunity, that the *res* was a Spanish warship and the district court thus lacked subject matter jurisdiction over Odyssey's claims because the vessel was immune from judicial arrest under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611. The district

_____

[*]Honorable Walter K. Stapleton, United States Circuit Judge for the Third Circuit, sitting by designation.

7

court granted Spain's motion to dismiss, concluding the *res* was the shipwreck of a sunken Spanish warship and was entitled to sovereign immunity. Having determined that the *res* is "immune from . . . arrest" in United States courts, we affirm. 28 U.S.C. § 1609.

## I. BACKGROUND

Odyssey is a deep-ocean exploration and shipwreck recovery business. In 2006, Odyssey began what it called the Amsterdam Project, researching ships that sank in a heavily-traveled area, which included an area off the coast of Gibraltar. Odyssey developed a list of target vessels to search for, one of which was the *Nuestra Senora de las Mercedes* (*Mercedes*), a Spanish vessel that sank in 1804. According to Odyssey, it "recogniz[ed] that Spain may have had a cultural (if not legal) interest in vessels that may be located within the Amsterdam area, [and] invited Spain to participate in the project." Odyssey's Resp. to Spain's Motion to Dismiss, Dkt. 138 at 3. Odyssey's CEO and counsel then met with a representative from Spain's Ministry of Culture. What occurred at the meeting is disputed, but both Odyssey and Spain agree Spain did not give Odyssey approval to salvage any sunken Spanish vessels.

In March 2007, while Odyssey was surveying the Amsterdam area, Odyssey discovered a shipwreck in international waters 100 miles west of the

8

Straits of Gibraltar at a depth of 1,100 meters. The remains of the shipwrecked vessel were spread over the seabed in an area 368 meters long and 110 meters wide. Odyssey conducted a detailed survey of the shipwreck before disturbing any artifacts on the ocean floor and then began to recover objects from the site. Odyssey ultimately recovered approximately 594,000 coins and a number of other small artifacts.

On April 9, 2007, Odyssey filed a verified complaint against "The Unidentified Shipwrecked Vessel, its apparel, tackle, appurtenances and cargo" in the Middle District of Florida. The complaint listed a possessory and ownership claim pursuant to the law of finds (Count One), as well as a salvage award claim pursuant to the law of salvage (Count Two).[1] It also noted Odyssey's intent to deposit with the court for symbolic arrest *in rem* a small bronze block recovered from the shipwreck.

On April 11, Odyssey filed a motion for an order directing the clerk to issue a warrant of arrest *in rem* against the shipwrecked vessel, its apparel, tackle, appurtenances, and cargo. Odyssey explained its intent to continue to recover artifacts from the site, and the motion provided that all artifacts and objects

---

[1] The complaint also sought a declaratory judgment that no government had the authority to interfere with Odyssey's exploration or recovery of the vessel. This claim is not before us on appeal.

recovered would be turned over to the U.S. Marshal or to a substitute custodian appointed by the court for symbolic arrest *in rem*. Upon order of the magistrate judge, the clerk issued a Warrant of Arrest In Rem against the shipwrecked vessel and its apparel, tackle, appurtenances, and cargo. The warrant commanded the U.S. Marshal to take possession of the bronze block and any future artifacts recovered from the shipwrecked vessel. The court then issued an order appointing Odyssey as substitute custodian of the shipwrecked vessel and any recovered artifacts "until further order of this Court."[2] Ord. Appointing Substitute Custodian at 2.

After Odyssey published a notice of arrest, Spain filed a verified claim to the vessel and its contents and cargo. On June 19, 2007, Spain filed a motion for a more definite statement and for disclosure of other information identifying the vessel and its contents. In the alternative, Spain sought an order dismissing the complaint, vacating the arrest, and terminating Odyssey's appointment as substitute custodian. Spain claimed Odyssey had not complied with the heightened pleading requirements for *in rem* complaints in admiralty, *see* Fed. R. Civ. P., Adm. Supp. R. C(2)(b), and had failed to provide information indicating

---

[2]The district court found Odyssey was "duly qualified to serve as the Substitute Custodian of artifact recovered from the Defendant Shipwrecked Vessel" and had "agreed to assume the responsibility of safekeeping the salvaged artifacts." Ord. Appointing Substitute Custodian at 2.

the origin or nationality of the vessel and whether the vessel was a military ship or other sovereign property of a foreign nation. Spain stated that such information was relevant to the court's subject matter jurisdiction, as the property of a sovereign nation would be immune from arrest under the FSIA. In addition, Spain argued the details provided in the complaint were insufficient to allow Spain to determine whether to invoke sovereign immunity of the *res* from arrest.

Odyssey responded by filing an amended complaint on August 6, 2007. It included the same *in rem* possessory and salvage claims as Odyssey's original complaint (Counts One and Two).[3] The amended complaint also stated Odyssey would present its Preliminary Site Assessment to the court under seal, and Odyssey would release information from the assessment to Spain as directed by the court. Odyssey claimed, however, it had "found no evidence which would confirm the identity of a ship or an interest of Spain or any other third party in this particular site." Amended Compl., Dkt. 21 at 6.

On September 19, 2007, Spain filed a motion to dismiss Odyssey's amended complaint, claiming Odyssey's *in rem* claims once again failed to meet the

---

[3]Odyssey's amended complaint also raised *in personam* claims against Spain that did not appear in the original complaint. These *in personam* claims, as well as Odyssey's declaratory judgment claim raised in both the original and amended complaints, were later dismissed by the district court and are not at issue in this appeal.

11

pleading requirements for admiralty actions *in rem*. Spain also asked the court to vacate the arrest and terminate Odyssey's appointment as substitute custodian. Although the district court ultimately denied this motion, it directed Odyssey to disclose certain information relating to the vessel's possible identity. In response to interrogatories from the court, Odyssey stated there was no confirmation the site represented any specific vessel, but disclosed it was considering the possibility the site was related to the Spanish vessel, the "*Nuestra Senora de las Mercedes y las Animas*."

Upon this disclosure, Spain claimed the *Mercedes* was a Spanish Royal Navy Frigate that exploded and sank in combat in 1804 and was therefore subject to sovereign immunity from all claims or arrest in the United States pursuant to the FSIA. Spain accordingly filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) or, in the alternative, to grant summary judgment in Spain's favor pursuant to Fed. R. Civ. P. 56(a). Spain claimed it was "indisputable" the *res* was the *Mercedes*, "a warship of the Royal Navy of Spain which is subject to immunity from Odyssey's claims in this Court and is not subject to salvage against the wishes of Spain." Spain's Mot. to Dismiss or for Summary Judgment, Dkt. 131 at 1-2. Spain requested the Court dismiss the claims against the *res*, vacate the arrest, withdraw Odyssey's designation as

substitute custodian, and direct that the artifacts in Odyssey's custody be turned over to the custody of Spain. Odyssey responded there was insufficient evidence to determine the *res* was the *Mercedes*, the FSIA was not a jurisdictional bar in this case, and sovereign immunity would not bar Odyssey's salvage claim. In addition, Odyssey argued that if, as Spain contested, the court did not have jurisdiction over the *res*, the court was without power to order the artifacts turned over to Spain.

The possible identification of the vessel as the *Mercedes* brought forward a number of additional claimants. Twenty-five claimants filed claims, arguing they had an interest in the cargo aboard the vessel. Twenty-four of the individuals alleged they were descendants of individuals with cargo aboard the *Mercedes*, and one individual claimed an ancestral interest in any of Spain's treasure in Florida. In addition, Peru filed a claim contending it had sovereign rights to property aboard the *Mercedes* that originated in its territory or was produced by its people.

On June 3, 2009, the magistrate judge issued a Report and Recommendation finding the *res* was the *Mercedes* and was the property of Spain. The magistrate judge concluded that under the FSIA the court was without jurisdiction to adjudicate the *in rem* salvage and possessory claims against the *Mercedes* and its

cargo. The magistrate judge recommended the district judge grant Spain's motion to dismiss and direct Odyssey, as substitute custodian, to return the *res* to Spain.

Odyssey, Peru, and the descendant claimants objected to the magistrate judge's report. The United States filed a Statement of Interest as Amicus Curiae in Support of the Kingdom of Spain. It argued the United States had a treaty obligation to afford sunken Spanish warships the same protections and immunities from implied abandonment and uncontested access and salvage as a sunken United States warship would receive in United States courts.

The district court adopted the magistrate judge's report and recommendation in full on December 22, 2009. The district court dismissed Odyssey's amended complaint for lack of subject matter jurisdiction, vacated the *in rem* arrest, and ordered Odyssey to return the *res* to Spain. The order to return the *res* was stayed pending this appeal.

On appeal, Odyssey, Peru, and the twenty-five individual claimants contend the district court erred by: (1) failing to use a Rule 56 summary judgment standard when analyzing Spain's Rule 12(b)(1) motion to dismiss; (2) failing to conduct an oral evidentiary hearing before ruling on the motion to dismiss; (3) finding the *res* is the Spanish warship the *Mercedes* and holding the FSIA grants it sovereign

immunity; (4) failing to distinguish between the *Mercedes* and the private cargo aboard; and (5) ordering the recovered *res* returned to Spain's custody.

## II. STANDARD OF REVIEW

When evaluating a district court's conclusions on a Rule 12(b)(1) motion, "[w]e review the district court's legal conclusions *de novo* and its factual findings for clear error." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009); *see also Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990) ("The usual standard of reviewing a district court's findings of jurisdictional facts is the clearly erroneous standard."). "As we have repeatedly held, the 'clearly erroneous' standard is highly deferential." *Carmichael*, 572 F.3d at 1280. We must affirm the district court's determination "so long as it is plausible in light of the record viewed in its entirety." *Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*, 329 F.3d 809, 816 (11th Cir. 2003) (quotation marks omitted); *see also Univ. of Ga. Athletic Ass'n v. Laite,* 756 F.2d 1535, 1543 (11th Cir. 1985) ("While the 'clearly erroneous' standard of review is less stringent than the well-known sports rule, 'The referee is always right,' it nevertheless presents a formidable challenge to appellants who . . . seek to overturn the factual findings of a district court.").

15

We review a district court's decision not to hold an evidentiary hearing for an abuse of discretion. *See Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 171-72 (5th Cir. 1994) (reviewing a district court's failure to conduct an evidentiary hearing on a party's Rule 12(b)(1) motion for lack of subject matter jurisdiction under the FSIA for an abuse of discretion).

## III.  DISCUSSION

A.    *Did the district court apply the correct standard in evaluating Spain's motion to dismiss?*

The district court evaluated Spain's Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction under the standard applied to Rule 12(b)(1) motions asserted on factual grounds.  This Court has explained that when a party raises a factual attack to subject matter jurisdiction–as opposed to a facial challenge based merely on the allegations in the complaint–the district court is not obligated to take the allegations in the complaint as true.  *Carmichael*, 572 F.3d at 1279.  Instead, the "court may consider extrinsic evidence such as deposition testimony and affidavits."  It may independently weigh the facts and is not constrained to view them in the light most favorable to the non-movant.  *Id.*  Applying this standard, the district court weighed the facts and determined that the *res* was a sunken Spanish warship over which it lacked jurisdiction.  As we

16

explain in Part III. C. 1, we conclude the district court did not clearly err in its factual determinations.

Odyssey argues the district court should not have independently weighed the facts under the Rule 12(b)(1) standard, but instead should have evaluated the facts under the standard applied to a motion for summary judgment under Fed. R. Civ. P. 56. Under this standard, Odyssey asserts, the court should have viewed the evidence in the light most favorable to Odyssey and drawn all justifiable inferences in its favor. Odyssey argues the Rule 56 standard is necessary because a motion to dismiss implicates the merits of the underlying claim in the case.

This Court has explained "[w]hen the jurisdictional basis of a claim is intertwined with the merits [of the claim], the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." *Dunbar*, 919 F.2d at 1530. "[J]urisdiction becomes intertwined with the merits of a cause of action when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Morris v. Amway Corp.*, 323 F.3d 920, 926 (11th Cir. 2003) (citation and quotations omitted).

In this case, jurisdiction is not intertwined with the merits of the cause of action. Although the FSIA governs the subject matter jurisdiction of the federal courts to hear this case, Odyssey has two substantive claims for relief: an *in rem* salvage claim, which is governed by salvage law; and an alternate claim of possessory rights and ownership under the law of finds. Since the FSIA provides only subject matter jurisdiction, and is not the basis for Odyssey's substantive claims, the same statute does not provide the basis for both the subject matter jurisdiction of the court and the plaintiff's substantive claims for relief such that jurisdiction is intertwined with the merits of the claim. Although Odyssey contends the motion to dismiss implicates the merits of the underlying claim, that a lack of subject matter jurisdiction bars a party's claim does not mean the jurisdictional question is itself related to the cause of action. *See Moran*, 27 F.3d at 172-73. Accordingly, the district court correctly applied the Rule 12(b)(1) standard for factual challenges to jurisdiction to Spain's motion for dismiss.

B. *Should the district court have held an evidentiary hearing when ruling on Spain's Rule 12(b)(1) motion?*

Odyssey contends the district court erred by failing to conduct an evidentiary hearing when deciding the Rule 12(b)(1) motion. Odyssey claims it should have been given an opportunity to orally cross examine Spain's experts.

18

"When a party challenges subject matter jurisdiction, the court is given the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue." *Id*. at 172; *see also Land v. Dollar*, 330 U.S. 731, 735, 67 S. Ct. 1009, 1011 n. 4 (1947) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court."(quotation marks and citation omitted)). When resolving factual disputes underlying a Rule 12(b)(1) motion, a court "'may' consider oral evidence along with written, but an evidentiary hearing is not required." *Moran*, 27 F.3d at 173.

Both the magistrate judge and the district court had before them what the district court referred to as "an encyclopedic treatment of the issues attendant to this controversy." Spain's motion to dismiss, Odyssey's response and Spain's reply were accompanied by a combined total of 125 attachments, including affidavits of multiple historians, counter-affidavits, copies of original Spanish documents from the Nineteenth Century with translations, photographs from the shipwreck site, and photographs of the artifacts recovered. Further, Odyssey introduced even more exhibits with its objections to the magistrate judge's report, including copies of original historical documents, translated documents, articles,

and excerpts from histories. Each party had a full opportunity to present evidence, including the ability to present counter-affidavits. The district court did not abuse its discretion by evaluating Spain's Rule 12(b)(1) motion based on the extensive record before it.[4]

C.    *Did the district court have subject matter jurisdiction over the res?*

The Constitution empowers the federal courts to hear "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III § 2, cl. 1. "'An *in rem* suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts.'" *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1314 (11th Cir. 2008) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 446-47, 114 S. Ct. 981, 985 (1994)).

Although federal courts have the exclusive power to adjudicate *in rem* suits against a vessel, that power is dependent on the court's jurisdiction over the *res*, the property named as the defendant. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943,

---

[4] Odyssey claims that *Chalwest (Holdings) Ltd. v. Ellis*, 924 F.2d 1011, 1014 (11th Cir. 1991), requires the district court to conduct an evidentiary hearing. The Court in *Chalwest* held "in a motion to dismiss for want of jurisdiction decided without an evidentiary hearing, the plaintiff must only present a prima facie case of jurisdiction to defeat the motion where it is the defendant's domicile that is at issue." *Id.* at 1013. No party's domicile is at issue here.

20

964 (4th Cir. 1999) (citing *Pennoyer v. Neff*, 95 U.S. 714, 724 (1877), *overruled in part by Shaffer v. Heitner*, 433 U.S. 186, 97 S. Ct. 2569 (1977)).  "Only if the court has exclusive custody and control over the property does it have jurisdiction over the property so as to be able to adjudicate rights in it that are binding against the world." *Haver*, 171 F.3d at 964.  Therefore, when a party files an *in rem* complaint, the court issues a warrant for the arrest of the *res* and the *res* remains in the court's custody for the remainder of the proceedings.  *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868 (11th Cir. 2010); *see also United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1113 (5th Cir. 1993) ("No *in rem* suit can be maintained without a valid arrest of the *res* by the marshal.")

If the *res* at issue is the property of a foreign state, the federal courts only have jurisdiction to arrest the *res* if authorized by the FSIA.  *See* 28 U.S.C § 1609; *see also Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1324 (11th Cir. 2003) ("Federal courts have jurisdiction to hear claims against foreign governments only if authorized by the Foreign Sovereign Immunities Act.").  Therefore, in order to determine if we have jurisdiction in this *in rem* action, we must determine first whether the *res* at issue is the property of a foreign state, and

21

second, if it is, whether the federal courts have jurisdiction over the *res* under the FSIA.

1.      Is the *res* the shipwreck of the *Mercedes*?

Odyssey argues there was insufficient evidence for the district court to conclude the *res* was the *Mercedes*. After an extensive review of the record, we conclude the evidence before the district court supports its factual determination that the *res* is the shipwreck of the *Mercedes* for the purposes of sovereign immunity.

a.      The *Mercedes* and its historical context

To determine whether the *res* is the *Mercedes* for the purposes of sovereign immunity, it is necessary to first understand the history of the *Mercedes* and the facts surrounding its final mission.[5] The facts surrounding the demise of the *Mercedes* are best understood in light of the geopolitical context of early 19th Century Spain.

Spain and Great Britain fought as allies against revolutionary France in the War of Convention from 1793 to 1795. In 1795, Spain signed the Peace of Basel with France, ending the hostilities between Spain and France. While they were

---

[5]All of the following facts are in the record before the district court.

technically at peace, Spain still feared French expansionism and France's stronger military and quickly entered into the Treaty of San Ildefonso with France on August 18, 1796. Under the treaty, Spain pledged support to France and became allied with France in its war against Great Britain. In 1800, Spain signed a second Treaty of San Ildefonso, reaffirming Spain's alliance with France. The second treaty also included significant Spanish concessions to France, including the cession of Louisiana by Spain to France. In March of 1802, France and Great Britain signed the Treaty of Amiens, which effected a short-lived peace between France and Great Britain, but did not abrogate Spain's alliance with France.

In 1803, Spain entered into a secret agreement with France where Spain agreed to pay France a large monthly sum equivalent to and in lieu of its military obligation to France under the Treaty of San Ildefonso. Spain hoped this agreement would allow it to maintain its alliance with France without provoking the British, thereby staving off a potential French invasion of Spain. However, Great Britain informed Spain it considered the financial support of France as grounds for attacking Spain.

In light of its extensive monetary obligations to France and the tenuous peace with Great Britain, Spain needed to marshal its funds and resources in

peninsular Spain. Spain thus utilized the peace from the Treaty of Amiens as an opportunity to collect funds from its various Viceroyalties. The Spanish *Generalisimo* of sea and land forces, Manuel Godoy, ordered warships be dispatched to the port of El Callao in Lima, part of the Spanish Viceroyalty of Peru, to collect and bring back to peninsular Spain specie[6] and other precious cargo. Following the *Generalisimo*'s orders, the Spanish Minister of the Navy dispatched two frigates of war to Lima, the *Mercedes* and the *Clara*.

The *Mercedes* was built by Spanish Navy engineers in 1788 at the Spanish Navy shipyard in Havana, Cuba. It had a distinguished naval career and took part in multiple military missions, including fighting against the British in both the Battle of the Cape of Saint Vincent in 1797 and in the defense of El Ferrol, Spain in 1800. It also conducted multiple missions transporting valuable Spanish effects, including transporting 500,000 *pesos fuertes* of the King and other valuables of Spanish citizens from the Spanish Viceroyalties of New Grenada and New Spain to peninsular Spain in 1798.

---

[6]"Specie" is defined as "[c]oin of the precious metals, of a certain weight and fineness, and bearing the stamp of the government, denoting its value as currency. Metallic money; *e.g.* gold or silver coins." Black's Law Dictionary 1398 (6th ed. 1990).

The *Mercedes* and the *Clara* set sail for Lima on February 27, 1803, from the Spanish naval base in El Ferrol. After stopping for repairs at the Spanish naval base in Montevideo, in present day Uruguay, the *Mercedes* reached Lima on August 7, 1803.

In Lima, the *Mercedes* took on board an extensive amount of specie and other cargo, including copper and tin ingots of the Royal Treasury, products of the Royal Revenue of Mails, proceeds of patriotic loans, ecclesiastic funds, military payroll and tree husks. It also took aboard specie of Spanish citizens. According to Spanish naval historians, it was an accepted practice at this time for a country to provide military transport for private property when the transport would pass through areas patrolled by hostile nations' warships. In all, the *Mercedes* was loaded with approximately 900,000 silver pesos, 5,809 gold pesos, and almost 2000 copper and tin ingots. The *Mercedes* was also loaded with two obsolete bronze cannons, commonly called culverins. The culverins were being returned to Spain for reuse of the bronze for other military purposes.

Shortly after the *Mercedes* arrived in Lima, the Viceroy of Peru was informed the Treaty of Amiens had been abrogated and France and Great Britain were once again at war. In light of the resumed hostilities between France and

Great Britain, the *Mercedes*' departure from Lima was delayed. The *Mercedes* ultimately left Lima on March 31, 1804, along with the *Clara* and another Spanish Navy frigate, the *Asuncion*. The three ships stopped in Montevideo on June 5, 1804. There, the *Clara* and the *Mercedes* were placed under the command of Royal Navy Commander General Jose de Bustamente y Guerra and joined a squadron of two other Spanish Navy frigates, the *Medea* and the *Fama*. The squadron thereafter consisted of four frigates: the *Mercedes*, the *Clara*, the *Medea*, and the *Fama*.

According to the official registry of the *Mercedes*, when it arrived at Montevideo its crew of 337 included eight Spanish naval officers, 63 marines, 69 artillerymen and gunners, 51 sailors, 103 sailors-in-training, and various other men performing different jobs aboard the ship. It was also armed according to Spanish Navy regulations for war frigates and carried 12-pounder and 6-pounder cannons, as well as 24-pounder and 3-pounder *obuses* or *pedreros*.[7]

The day before the squadron left Montevideo, the second in command of the squadron fell ill and had to be replaced. Captain Diego de Alvear, who was aboard

---

[7]The exact number of cannons the *Mercedes* carried is disputed. Spain and one of Odyssey's experts claims the Mercedes carried 50 cannons, while another one of Odyssey's experts claims it carried only 33-40 cannons.

the *Mercedes* and was returning to Spain with his family, was moved from the *Mercedes* to the *Medea* to replace the second in command. Captain Alvear's family, including his wife, four daughters, three sons, and one nephew, stayed aboard the *Mercedes*.

The squadron set sail from Montevideo for Cadiz on August 9, 1804. On the morning of October 5, 1804, when the Spanish squadron was only one day's sail from Cadiz, it was intercepted by a British squadron. Four Royal British Navy ships, under the command of Commodore Graham Moore, had been sent by the British Navy Admiralty to intercept Spanish warships transporting treasure back to Spain. The Spanish frigates, having sighted the British frigates headed towards them, assumed a combat formation. A British officer was sent aboard the *Medea* and informed the Spanish that the British King had ordered the British Navy to detain the Spanish squadron and take it to England. The Spanish refused the British order, and what was to become known as the Battle of Cape Saint Mary soon commenced.

Only a few minutes after the battle began, the *Mercedes* exploded. Captain Alvear, whose family was aboard the *Mercedes*, later wrote "The *Mercedes* jumped through the air making a horrible racket, covering us [on the *Medea*] with a thick

rain of debris and smoke." Except for fifty sailors, everyone aboard the *Mercedes*

was killed, including Captain Alvear's entire family. The remaining three Spanish

frigates surrendered and were taken by the British squadron to England. Partly as a

consequence of the Battle of Cape Saint Mary, Spain declared war against Great

Britain and entered into the Napoleonic Wars as an ally of France.

        b.      The *res* is the *Mercedes*

In this historical context, the entirety of the record evidence supports the

district court's conclusion that the *res* is the *Mercedes*. The *res* was found within

the zone Spain had plotted as the likeliest area of the *Mercedes*' demise, and no

other naval vessels matching the *Mercedes*' type sank within that zone during the

same time period. The site, essentially a scattered debris field, is consistent with a

vessel that exploded at the surface. Moreover, the composition of the examined

sampling of coins found on the *res* matches that of the 900,000 mostly silver coins

aboard the *Mercedes*: almost all the coins are silver; they were all minted in the late

18th and early 19th Centuries and none were minted later than 1804; and they were

almost exclusively minted in Lima and Bolivia. The 17 cannons found at the site,

consisting of 6- and 12-pounder cannons, match the type the *Mercedes* would have

carried. The site contains at least one bronze culverin, matching the distinctive

cannons the *Mercedes* was carrying to be recycled. The site also includes large quantities of copper and tin ingots, matching the large quantity carried by the *Mercedes*, and contains copper plates like those used to sheath the hull of the *Mercedes*.

Despite this evidence, Odyssey contends the artifacts recovered do not match the cargo of the *Mercedes*. It points out that the *Mercedes* was carrying 900,000 coins and 33-50 cannons, whereas Odyssey has only recovered 595,000 coins and seventeen cannons. We find this argument unconvincing. The failure to fully recover all artifacts carried by the *Mercedes* is understandable considering the *Mercedes* exploded at the surface, sank 1,100 meters, scattered over a large area, and has been sitting on the ocean floor for more than 200 years.

Odyssey also argues the *res* cannot be the *Mercedes* because Odyssey did not find an intact vessel. Although it is undisputed the shipwreck site does not contain an "intact" vessel, this fact is not determinative. As one of Odyssey's own experts acknowledged, the site is consistent with a vessel that broke up at the surface and descended through the water. There is evidence of an actual vessel at the site, including copper plates like those used to sheath a hull. The site and thus the *res* is a shipwreck, even though no intact vessel was found.

29

Furthermore, Odyssey acknowledged when it found the shipwreck that it was the remains of a vessel. Odyssey filed both its original complaint against and a motion seeking the arrest of "The Unidentified Shipwrecked Vessel, its apparel, tackle, appurtenances and cargo." The district court, at Odyssey's request, issued a warrant for the arrest of "The Unidentified Shipwrecked Vessel, its apparel, tackle, appurtenances and cargo." Therefore, the evidence in the record fully supports the finding of the district court that the *res* is the *Mercedes* for the purposes of sovereign immunity.[8]

2.      Does the FSIA apply to the *Mercedes*?

As we previously noted, in order for the federal courts to have jurisdiction over this *in rem* action, we must first determine whether the *res* at issue is the

---

[8]The fact that the *Mercedes* has been sitting on the ocean floor for over 200 years does not negate Spain's property interest in the shipwreck. Under the 1902 Treaty of Friendship and General Relations between the United States of America and Spain, shipwrecked "Spanish vessels, like those belonging to the United States, may only be abandoned by express acts." *Sea Hunt, Inc. v. The Unidentified Shipwrecked Vessel or Vessels*, 221 F.3d 634, 638, 642 (4th Cir. 2000); *see also* Sunken Military Craft Act, Pub. L. No. 108-375, § 1406, 118 Stat. 1811, 2097 (2004) ("The law of finds shall not apply to . . . any foreign sunken military craft located in United States waters," and "[n]o salvage rights or awards shall be granted with respect to . . . any foreign sunken military craft located in United States waters without the express permission of the relevant foreign state."); Protection of Sunken Warships, Military Aircraft and Other Sunken Government Property, 69 Fed. Reg. 5647-01, 5648 (Feb. 5, 2004) (President Clinton's January 19, 2001, statement that the United States "recognizes that title to a United States or foreign sunken State craft, wherever located, is not extinguished by passage of time, regardless of when such sunken State craft was lost at sea"). The shipwreck of the *Mercedes* is thus unquestionably the property of Spain.

30

property of a foreign state, and second, if it is, whether the federal courts have jurisdiction over it under the FSIA. The district court did not err in determining the *res* is the *Mercedes*. It is uncontested the *Mercedes* is the property of Spain. We must now determine if the district court correctly decided that FSIA immunity applies to the arrest of the *Mercedes*.

> a. Section 1609 provides the *Mercedes* with presumptive immunity from arrest

Section 1609 of the FSIA states: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609. The *Mercedes* is Spain's sovereign property that is within the United States. While the *Mercedes* itself is not within the United States, that alone does not defeat the court's ability to obtain jurisdiction over it. A court may have either actual or constructive possession over the *res*. *See The Brig Ann*, 13 U.S. 289, 291 (1815). A court can exercise constructive possession over a shipwreck when part of the shipwreck is presented to the district court. *See*, *e.g.*, *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 494, 118 S. Ct. 1464, 1467 (1998). A salvor is thus able to bring a shipwreck found in international waters

31

constructively within a court's territorial jurisdiction by having a portion of the shipwreck within the jurisdiction. *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 967-69 (4th Cir. 1999) (concluding a shipwreck found in international waters can "constructively" be considered within the jurisdiction of the district court, although the district court's sovereignty over the wreck is a "'shared sovereignty,' shared with other nations enforcing the same [law of all nations]"). Odyssey has deposited parts of the *Mercedes* with the district court, constructively bringing the shipwreck within the court's territorial jurisdiction. Because this is an *in rem* action based on the arrest of sovereign property, § 1609 provides the *Mercedes* with presumptive immunity from arrest.

> b. The *Mercedes* does not fall within any of the FSIA exceptions to *in rem* immunity

Because § 1609 provides the *Mercedes* with presumptive immunity from arrest on these facts, the only way a federal court can obtain jurisdiction is if an exception to § 1609 applies. Odyssey has the burden of overcoming the presumption that the *Mercedes* is immune from arrest. *See S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000) ("To establish subject matter jurisdiction under the FSIA, a plaintiff must overcome the presumption that the foreign state is immune from suit in the United States' courts.

32

. . . In order to overcome the presumption of immunity, a plaintiff must prove that the conduct which forms the basis of its complaint falls within one of the statutorily defined exceptions.") (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610-11, 112 S. Ct. 2160 (1992)).  If Odyssey offers evidence one of the FSIA exceptions to immunity applies, the burden shifts to Spain to show, by a preponderance of the evidence, that the exception does not apply.  *Id.*

Although §§ 1610 and 1611 are the only statutory exceptions to a sovereign property's immunity from arrest, *see* § 1609, Odyssey fails to invoke either of these exceptions.  Because Odyssey has failed to satisfy its burden by proving that either § 1610 or § 1611 applies, we would normally end the analysis at this point. Odyssey, however, argues the *Mercedes* was engaged in commercial activity and is exempt from any FSIA protection by virtue of the FSIA's incorporation of existing international agreements that exempt commercial vessels from sovereign immunity. *See* U.S.C. § 1609 (explaining that immunity from arrest is "[s]ubject to existing international agreements which the United States is a party at the time of enactment.").  Specifically, Odyssey points to language in the 1958 Geneva Convention on the High Seas stating, "Ships owned or operated by a state and used only on government non-commercial service shall, on the high seas, have complete

33

immunity from the jurisdiction of any State other than the flag State." Art. 9,

*entered into force* Sept. 30, 1962, 13 U.S.T. 2312, 450 U.N.T.S. 11.[9] On its face,

this language creates an affirmative grant of immunity to vessels engaged in "non-

commercial service." It does not, as Odyssey contends, appear to create a

commercial activity exception to § 1609's immunity to arrest. However, even if it

did, this argument fails because the *Mercedes* was not engaged in commercial

activity.[10]

The FSIA defines a "commercial activity" as: "[e]ither a regular course of

commercial conduct or a particular commercial transaction or act. The commercial

character of an activity shall be determined by reference to the nature of the course

of conduct or particular transaction or act, rather than by reference to its purpose."

28 U.S.C. § 1603(d).[11] The Supreme Court acknowledged in *Weltover* that this

---

[9]Odyssey also cites to the 1926 Brussels Convention for the Unification of Certain Rules Relating to the Immunity of State-Owned Vessels, *entered into force* Jan. 8, 1937, 176, L.N.T.S. 199. However, as the United States has not ratified this Convention and was not a party to it at the time the FSIA was enacted, it would not apply under the terms of the FSIA. *See* 6B Benedict on Admiralty § 8-41 (Frank L. Wiswall, Jr. ed., 7th ed. 2011).

[10] Odyssey did not raise a commercial activity argument under § 1610, which provides for exceptions from attachment for property "used for a commercial activity in the United States," and would thus not apply. *See* 28 U.S.C. § 1610. Instead, Odyssey improperly invoked § 1605(b)'s commercial activity exception, which as we explain in Part III. C. 2. c., also does not apply.

[11]The 1958 Geneva Convention on the High Seas does not define "commercial."

definition "leaves the critical term 'commercial' largely undefined." 504 U.S. at

612, 112 S. Ct. at 2165. The Supreme Court clarified that an activity is commercial

under the FSIA: "when a foreign government acts, not as regulator of a market, but

in the manner of a private player within it." *Id.* at 614, 112 S. Ct. at 2166. It

elaborated:

> [B]ecause the Act provides that the commercial character of an act is
> to be determined by reference to its 'nature' rather than its 'purpose,'
> 28 U.S.C. § 1603(d), the question is not whether the foreign
> government is acting with a profit motive or instead with the aim of
> fulfilling uniquely sovereign objectives. Rather, the issue is whether
> the particular actions that the foreign state performs (whatever the
> motive behind them) are the *type* of actions by which a private party
> engages in 'trade and traffic or commerce,' *Black's Law Dictionary*
> 270 (6th ed. 1990).

*Id.* In *Guevara v. Peru*, this Court explained that "[w]e read *Weltover* to mean that

'[a] foreign state is commercially engaged when it acts like an ordinary private

person, not like a sovereign, in the market.'" 468 F.3d 1289, 1298 (11th Cir. 2006)

(quoting *Hond. Aircraft Registry, Ltd. v. Gov't of Hond.*, 129 F.3d 543, 548 (11th

Cir. 1997)).

Odyssey points to several facts suggesting the *Mercedes* was serving in a

commercial capacity. Specifically, Odyssey claims the *Mercedes* was carrying

goods and specie for freight, 75% of the cargo measured by value was privately

35

owned, private merchants were charged a 1% freight rate to ship their goods aboard the *Mercedes*, and Spain was not at war when the *Mercedes* sunk.  In addition, Odyssey argues the *Mercedes* was serving as a commercial transport vessel for the Spanish *Correos Maritimos* (Maritime Mail Service).

After reviewing the record evidence, we conclude the *Mercedes* was not "act[ing] like an ordinary private person" in the marketplace.  *See id.*  At the time it sank, the *Mercedes* was a Spanish Navy vessel.  According to the 1804 official registry of ships of the Royal Spanish Navy, the *Mercedes* was assigned to the Spanish Navy fleet based at El Ferrol as one of nine frigate class ships.   It was under the command of a Spanish Navy captain both when it left El Ferrol and when it was sunk.  It delayed its departure from Lima to comply with Spanish Navy orders to prepare for war with the British.  The crew was made up of Spanish Navy officers, sailors and marines, its armament was the standard armament of Spanish warships, and Captain Alvear's family and servants were traveling with official authorization.  It was also carrying a substantial amount of Spanish Government specie and cargo, including money at the Minister of the Treasury's disposal, war donations, and copper and tin ingots.

Although the *Mercedes* did transport private cargo of Spanish citizens for a charge, the transport was of a sovereign nature. According to Spanish naval historians, providing protection and safe passage to property of Spanish citizens was a military function of the Spanish Navy, especially in times of war or threatened war. This function was particularly important during the late 18th and early 19th Centuries, when ships traveling between Spain and its American Viceroyalties had to pass through areas patrolled by hostile nations' warships. Therefore, the *Mercedes* was "act[ing] . . . like a sovereign" by transporting specie during a time of threatened war. *Guevara*, 468 F.3d at 1298.[12]

In support of its position that the *Mercedes* was engaged in commercial activity, Odyssey also contends the *Mercedes* was a part of the *Correos Maritimos*, an official entity of the Spanish government dedicated to handling and transporting mail. The *Correos Maritimos* generally consisted of small, fast and lightly armed vessels that sailed to Spain's overseas Viceroyalties from their home base in La Coruna, Spain. Spain presented ample evidence the *Mercedes* was not part of the *Correos Maritimos*, including: historical records listing the *Mercedes* as part of the

---

[12]Odyssey argues the *Mercedes* cannot be a warship because Spain was not at war with the British when it was sunk. Odyssey has failed to point to any law supporting this argument. Further, this argument would negate the warship status of many sunken military vessels, including the *U.S.S. Arizona* at Pearl Harbor. A country need not be at war for a sunken navy vessel to be a warship, as countries have navies both during times of war and times of peace.

Spanish Navy and a warship; records listing vessels that were part of the *Correos Maritimos*, which do not include the *Mercedes*; and records showing the *Mercedes'* orders came from the Minister of the Navy rather than the Minister of State, who controlled the *Correos Maritimos*. The district court did not clearly err in concluding the *Mercedes* was a warship and not part of the *Correos Maritimos*.

Because Spain was acting like a sovereign, not a private person in the marketplace, we conclude the *Mercedes* was not conducting commercial activity and is immune from arrest under the FSIA.

c. Section 1605(b) does not apply to the *Mercedes*

Odyssey also attempts to circumvent § 1609 by arguing that § 1605(b), which refers to the immunity of a foreign state from claims when a suit is brought to enforce a maritime lien, provides this court with jurisdiction. This interpretation is inconsistent with the plain language of the FSIA.

The FSIA establishes two broad grants of immunity, which apply to different types of claims and are subject to different sets of exceptions. Section 1609, which we have explained applies to Odyssey's *in rem* claims, provides the *property* of a foreign state with immunity from arrest, attachment, and execution and states that exceptions are provided in §§ 1610 and 1611. 28 U.S.C. § 1609. In contrast,

§ 1604 provides immunity to the foreign *state itself* and states that exceptions are provided in §§ 1605 to 1607. 28 U.S.C. § 1604. The structure of the statute and the clear language of § 1609 and § 1604 thus preclude reading § 1605(b) to control the *in rem* arrest in this case. *See Mangattu v. M/V IBN HAYYAN*, 35 F.3d 205, 209 (5th Cir. 1994) (stating the plain language of § 1609 precludes reading the language of §§ 1605 and 1606 to control an issue of attachment). Section 1605(b) is an exception only to the general immunity of the foreign state itself from claims under § 1604 and thus does not apply to Odyssey's *in rem* claims against Spain's property. 28 U.S.C. § 1604.

### d. The FSIA does not contain a possession requirement

Finally, Odyssey posits the *Mercedes* is not immune from arrest because the FSIA only applies when sovereign property is in the sovereign's possession, and Spain was not in possession of the *res*. This argument does not rest on any language in the statute, but on Odyssey's interpretation of *California v. Deep Sea Research*, 523 U.S. 491, 118 S. Ct. 1464 (1998), and *Aqua Log, Inc. v. Georgia*, 594 F.3d 1330 (11th Cir. 2010), two cases that addressed the sovereign immunity of a state's property under the Eleventh Amendment. Odyssey claims these cases

establish a sovereign may claim immunity in an *in rem* admiralty action only when the sovereign is in possession of the *res*.

We note first that neither of these cases contain any holding regarding the immunity of a foreign sovereign's property. Rather, these cases concerned state property and the Eleventh Amendment. *See Deep Sea Research*, 523 U.S. at494, 507-08, 118 S. Ct. at 1467, 1473 (holding the Eleventh Amendment does not bar jurisdiction over vessels that are not in the State's possession and stating the case "requires us to address the interaction between the Eleventh Amendment and the in rem admiralty jurisdiction of the Federal Courts"); *see also Aqua Log*, 594 F.3d at 1335 (holding the Eleventh Amendment does not bar jurisdiction over a case where Georgia claimed to own logs sunk at the bottom of a river that were not within Georgia's actual possession). Regardless of any possession requirement the courts have imposed on a U.S. state claiming immunity of its property, there is no support to conclude these cases alter the immunity Congress specifically provided to property of foreign states under the FSIA.

Moreover, it is clear we look only to the FSIA to determine if any possession requirement exists. Subject matter jurisdiction of the "lower federal courts is determined by Congress in the exact degrees and character to which Congress may

40

seem proper for the public good." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433, 109 S. Ct. 683, 688 (1989) (quotation marks omitted). Congress has mandated "[c]laims of foreign states to immunity should [] be decided by courts . . . in conformity with the principles set forth in [the FSIA]." 28 U.S.C. § 1602. The Supreme Court has made clear the FSIA "provides the *sole basis* for obtaining jurisdiction over a foreign state." *Amerada Hess Shipping Corp.*, 488 U.S. at 443, 109 S. Ct. at 693 (emphasis added); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 497-98, 103 S. Ct. 1962, 1973 (1983) (stating "deciding whether statutory subject matter jurisdiction exists under the Foreign Sovereign Immunities Act entails an application of the substantive terms of the Act to determine whether one of the *specified* exceptions to immunity applies") (emphasis added).

An examination of the FSIA reveals no possession requirement exists in any part of the statute.[13] When Congress determined "the exact degree[] and character" of subject matter jurisdiction over the property of foreign sovereigns under the FSIA, it did not provide an exception to immunity for property not in a foreign

---

[13]Odyssey asserts the FSIA contains a possession requirement in § 1605(b). As we have previously stated, § 1605 does not apply because it is an exception to the sovereign immunity of a foreign state provided by § 1604, whereas immunity here is granted under § 1609. *See* 28 U.S.C. § 1604. Regardless, an examination of § 1605(b) shows it does not impose a possession requirement.

sovereign's possession. *Amerada Hess Shipping Corp.*, 488 U.S. at 433, 109 S. Ct. at 688.

Finally, Odyssey, as well as Peru, cites to *Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*, 303 U.S. 68, 58 S. Ct. 432 (1938), as holding a foreign government cannot claim sovereign immunity over a vessel not in its possession.[14] *The Navemar* was decided before the FSIA was enacted. Even if cases prior to the enactment of the FSIA imposed a possession requirement, the FSIA preempts any prior possession requirement. *See Amerada Hess Shipping Corp.*, 488 U.S. at 443, 109 S. Ct. at 693 (stating the FSIA "provides the *sole basis* for obtaining jurisdiction over a foreign state") (emphasis added); *see also* H.R. Rep. 94-1487, at 12 (1976) (noting the FSIA "is intended to preempt any other State or Federal law (excluding applicable international agreements)"). We hold FSIA immunity applies regardless of whether the property of a foreign sovereign is in that sovereign's possession at the time of arrest.

D.    *Is the cargo aboard the Mercedes severable from the shipwreck of the Mercedes in determining immunity?*

---

[14]We do not address whether this is an accurate representation of *The Navemar*'s holding.

Odyssey, Peru, and all twenty-five individual claimants assert that even if the *Mercedes* is immune from arrest, the cargo aboard the *Mercedes*, and therefore the treasure that has been salvaged from the shipwreck, is not immune. The individual claimants argue they have a right to the cargo because they are descendants of those who had an interest in cargo on the *Mercedes*, and Peru claims it has a patrimonial interest in cargo that originated in its territory. Together, they argue the treasure is not immune because the cargo aboard the *Mercedes* is private property that is severable from the shipwreck. Indeed, Peru's and the individual claimants' entire arguments regarding their rights to the treasure are premised on the notion that the cargo, not the shipwreck, is the relevant *res*.

No party has pointed us to any case or statute that directly answers the question of whether cargo aboard a sunken military vessel is entitled to the same sovereign immunity as the sunken vessel. None of the cases cited by Odyssey in support of its argument that cargo is separate from a vessel concern cargo aboard a sunken military vessel.

As we discuss below, we are persuaded that in the context of a sunken Spanish military vessel, the cargo and the shipwreck are interlinked for immunity purposes. Two reasons support this conclusion: first, other statutes governing

shipwrecks, including the Sunken Military Craft Act (SMCA), Pub. L. No. 108-375, §§ 1401-08, 118 Stat. 1811, 2094-98 (2004), which would govern the salvage claims against the *Mercedes*, treat cargo as part of the shipwreck; and second, the principles of comity discussed in the Supreme Court's decision in *Republic of the Philippines v. Pimentel*, 553 U.S. 851, 128 S. Ct. 2180 (2008), lead us to consider the potential for injury to the interest of the sovereign.

1. Cargo treated as part of the shipwreck

In 1902, the United States and Spain signed a treaty mandating "[i]n cases of shipwreck . . . each party shall afford to the vessels of the other, whether belonging to the state or to individuals, the same assistance and protection and the same immunities which would have been granted to its own vessels in similar cases." 1902 Treaty of Friendship and General Relations Between the United States of America and Spain, art. X, July 3, 1902, 33 Stat. 2105. Under this treaty, the United States must afford the *Mercedes*, as a shipwrecked Spanish warship, the same protection it would give a shipwrecked United States military vessel.

The United States considers the cargo of a shipwrecked U.S. military vessel part of the shipwreck and gives it the same immunities as the shipwreck. Under the SMCA, the rights, title and interest of the United States in any sunken military craft

are protected absent an "express divestiture of title." § 1401, 118 Stat. at 2094. The definition of a "sunken military craft" includes a sunken warship or other military vessel, as well as "all or any portion of . . . the associated contents of a craft." § 1408(3)(C), 118 Stat. at 2098. "Associated contents" are defined as "the equipment, *cargo*, and contents of a sunken military craft that are within its debris field . . . [and] the remains and personal effects of the crew and passengers of a sunken military craft that are within its debris field." § 1408(1), 118 Stat. at 2097 (emphasis added). Thus, under the 1902 treaty, the *Mercedes* and its cargo are entitled to the same immunities provided by the SMCA.

Treating the cargo as part of the shipwrecked *Mercedes* is also consistent with the Abandoned Shipwreck Act (ASA), Pub. L. 100-298, § 2102(d), 102 Stat. 432 (1988). Under the ASA, the Federal Government asserts and transfers title of any "abandoned shipwreck" to the state in whose submerged lands the wreck is embedded. Like the SMCA, the ASA defines "shipwreck" as "a vessel or wreck, its *cargo* and other contents." *Id.* (emphasis added); *see also* U.S. Dep't of Interior, National Park Service Abandoned Shipwreck Act Guidelines, 55 Fed. Reg. 50116-01, 50121 (Dec. 4, 1990) ("Any cargo aboard a vessel entitled to sovereign immunity also generally remains the property of the flag nation unless the cargo

45

had earlier been unlawfully captured by that nation."). Therefore, under the ASA, the cargo that was aboard the *Mercedes* would not be considered separate from the shipwreck.[15]

While the SMCA and the ASA do not state cargo is part of the vessel for immunity purposes, they show the protections awarded to a sunken sovereign vessel also extend to the cargo aboard that vessel. As evidenced by the SMCA, those protections are heightened when the sunken vessel is a military vessel. We grant the cargo on a sunken Spanish military vessel the same sovereign immunity protection we grant the vessel.

2.      The promotion of Spain's comity interest

Granting the cargo on a sunken Spanish military vessel the same sovereign immunity protection as the vessel is also consistent with the heightened protection

---

[15]In addition, a site where the remains of a vessel are strewn on the ocean floor is still a shipwreck even if an intact vessel no longer remains. Our conclusion is based on the plain meaning of "shipwreck," which is defined as "a ship's wreckage." *See* Black's Law Dictionary 1504 (9th ed. 2009) (citing 4 James Kent, Commentaries on American Law at 323 n. (b) (George Comstock ed., 11th ed. 1866) (stating a shipwreck includes a vessel which "is dashed to pieces")). Under its plain definition, a shipwreck covers not only a sunken intact vessel, but also a vessel that was "dashed to pieces" or exploded at the surface and then sank to the ocean floor. Our plain-meaning interpretation of "shipwreck" is supported by statutory definitions.

Furthermore, Odyssey filed both its original complaint against and a motion seeking the arrest of "The Unidentified Shipwrecked Vessel, its apparel, tackle, appurtenances and cargo." The district court, at Odyssey's request, issued a warrant for the arrest of "The Unidentified Shipwrecked Vessel, its apparel, tackle, appurtenances and cargo."

46

we grant sovereigns when there is a potential of injury to the sovereign's interest. In *Pimentel*, the Republic of the Philippines and a sovereign Filipino Commission were dismissed as defendants in an interpleader action pursuant to the FSIA. 553 U.S. at 859, 128 S. Ct. at 2186. The action concerned various parties' claims against assets in a Merrill Lynch brokerage account, which included funds allegedly illicitly obtained by an ex-President of the Philippines. *Id.* at 857, 128 S. Ct. at 2185. After the Philippines and the Commission were dismissed, the district court awarded the assets to another party, reasoning the Philippines' and the Commission's claims against the assets had so little likelihood of success on the merits that the action could proceed without them. *Id.* at 860, 128 S. Ct. at 2187. The Supreme Court reversed, concluding that when a sovereign that is a required party in an interpleader action asserts sovereign immunity and raises non-frivolous claims, "dismissal of the action must be ordered where there is a potential for injury to the interest of the absent sovereign." *Id.* at 867, 128 S. Ct. at 2191. The Court explained that in failing to dismiss the action, the district court failed to give full effect to sovereign immunity and the promotion of the comity interest that underlies that doctrine. *Id.* at 865-66, 128 S. Ct. at 2190. It stated the "Republic and the Commission have a unique interest in resolving the ownership of or claims to the [] assets," and a "specific affront [] could result to the Republic and the

47

Commission if the property they claim is seized by the decree of a foreign court."
*Id.* at 866, 128 S. Ct. at 2190.

While *Pimentel* is factually distinguishable, we find its reasoning instructive. The same "promotion of the comity interest" that led the Supreme Court to dismiss the action in *Pimentel* compels this Court to treat the cargo and the *Mercedes* as one for sovereign immunity purposes. *Id.* There is an undeniable potential for injury to Spain's interest if we separated the *Mercedes* from its cargo and upheld an arrest of the cargo found and salvaged from a warship that is entitled to immunity. The silver coins and all other artifacts Odyssey has salvaged and flown to Tampa came from the *Mercedes*. While various parties may have cognizable claims against parts of the recovered *res*, even by Odyssey's own estimate approximately 25% of the cargo, measured by value, was Spanish government property. Moreover, Spain has an even greater interest in the sovereign immunity of its sunken warships. Thus, the FSIA immunity from *in rem* suits in U.S. courts given to the *Mercedes* applies to the shipwreck as a whole, including the cargo, even if such cargo was owned by private individuals or has been salvaged from the wreck.[16]

---

[16]We do not hold the recovered *res* is ultimately Spanish property. Rather, we merely hold the sovereign immunity owed the shipwreck of the *Mercedes* also applies to any cargo the

48

Because the cargo aboard the *Mercedes* is treated as part of the shipwreck of the *Mercedes* for sovereign immunity purposes, the *Mercedes*' immunity precludes Peru's attempt to institute an action in United States courts against any part of the *Mercedes* or any cargo it was carrying when it sank. This applies whether or not Peru has a patrimonial interest in the cargo. This also applies to the claims against the *res* by the twenty-five individual claimants.[17]

E.      *Did the district court err when it ordered the res released to the custody of Spain?*

The district court vacated the arrest and ordered Odyssey, as the substitute custodian, to return the recovered *res* to Spain. Odyssey argues this order serves as a substantive ruling on the merits that is beyond the district court's power because the court lacks subject matter jurisdiction. Odyssey contends the court is only empowered to return the parties to their positions prior to the arrest of the *res* and, therefore, the recovered *res* should be returned to Odyssey because Odyssey was in possession of the *res* immediately prior to the arrest. It argues the district court's

---

*Mercedes* was carrying when it sank.

[17]This holding is limited to the facts in this case, where the cargo was found aboard a sunken active duty Spanish military vessel and was legally placed aboard the vessel.

49

order "transferred" the property from Odyssey to Spain, which the district court had no authority to do. We disagree.

When this action was initiated, Odyssey filed a motion for an order directing the clerk to issue a warrant of arrest *in rem* against the shipwrecked vessel, its apparel, tackle, appurtenances, and cargo. Odyssey stated "[a]ny further artifacts recovered from the Defendant Shipwrecked Vessel will be recovered under the jurisdiction of this Court, and will be within the actual and/or constructive possession of this Court or its duly-appointed substitute custodian during the pendency of this action." Odyssey's Verified Complaint in Admiralty In Rem at 4-5, Dkt. 1. The court issued a Warrant of Arrest In Rem against the shipwrecked vessel and its apparel, tackle, appurtenances, and cargo. The warrant commanded the U.S. Marshal to take possession of the *res* and any future artifacts recovered from the shipwrecked vessel. The district court appointed Odyssey as substitute custodian of the shipwrecked vessel and any recovered artifacts "until further order of this Court." Ord. Appointing Substitute Custodian at 2, Dkt. 8.

By virtue of the issuance of the arrest warrant, the court is currently in possession of approximately 594,000 recovered coins and other artifacts. It necessarily follows that the court, after determining the *res* was immune from

arrest, must have the ability to release the *res* from its custody. A contrary conclusion would lead inexorably to court custody *in perpetuity*. We have determined the arrest of the recovered *res* must be vacated, and therefore the district court must now release the property.

The Fed. R. Civ. P. Supplemental Admiralty Rules provide little instruction on how a court should release previously arrested property when the court does not have subject matter jurisdiction over the property. Supplemental Rule E(5)(d) states "the property arrested shall be released only by order of the court, on such terms and conditions . . . as the court may require." The rule does not state to whom the *res* should be released, only that it should be released according to the "terms and conditions" best seen fit by the court.

We note, the release from custody sought by Odyssey would not, as Odyssey contends, return matters to the status quo at the commencement of this suit. The U.S. Marshal seized the *res* approximately one month after Odyssey discovered the site in March of 2007. Odyssey continued recovery operations after the order of arrest. While Odyssey may have had prior custody of some items from the site, the remainder of the recovered *res* was received in Odyssey's capacity as custodian for and under the authority and protection of the court.

51

Moreover, releasing the *res* to the custody of Spain is not, as Odyssey attempts to characterize it, a "transfer." Odyssey holds the *res* as a substitute custodian of the district court; the *res* remains *in custodia legis* (in the court's possession). By ordering Odyssey, as substitute custodian, to release the *res* into Spain's custody, the court is relinquishing its control of the *res* and releasing it to the party that has a sovereign interest in it. Further, Spain's sovereign interest in the *res* existed before Odyssey initiated this action and deposited the parts of the *res* it had salvaged from the shipwreck.

In fact, releasing the *res* to Odyssey rather than Spain would be inconsistent with Spain's rights under the 1902 Treaty of Friendship and General Relations between the United States of America and Spain. As discussed previously, this treaty requires the United States to extend to Spanish shipwrecked vessels the same protection and immunities afforded to its own shipwrecked vessels in similar circumstances. 1902 Treaty of Friendship and General Relations Between the United States of America and Spain, art. X, July 3, 1902, 33 Stat. 2105. The United States protects its sunken warships from unauthorized private party access and possession. *See* SMCA, §§ 1402(b), 1408, 118 Stat. 2094. Thus, the 1902 Treaty requires the *Mercedes* be afforded the same protection and immunities from unauthorized access and salvage.

Finally, the Supreme Court's reasoning in *Pimentel*, which led us to conclude the cargo recovered from the *Mercedes* must receive the same sovereign immunity protection as the *Mercedes* itself, also supports our decision to affirm the district court's order to release the *res* into Spain's custody. The Supreme Court noted the "specific affront that could result" to a foreign state "if property they claim is seized by the decree of a foreign court." *Pimentel*, 553 U.S. at 866, 128 S. Ct. at 2190. The same affront would result here if the *res*, which the district court improperly arrested, was then released to Odyssey. This would force Spain to file suit against Odyssey to retrieve property that is protected by Spain's sovereign immunity.

For the foregoing reasons, the district court did not err when it ordered Odyssey to release the recovered *res* to the custody of Spain.

IV. CONCLUSION

We AFFIRM the district court's grant of Spain's motion to dismiss.

**AFFIRMED.**